

Molly M. Winston
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for Obet Cortez-Mendoza

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
Hon. Rosanna Malouf Peterson

| | |
|---|---|
| United States,<br><br>                          Plaintiff,<br><br>          v.<br><br>Obet Cortez-Mendoza,<br><br>                          Defendant. | No. 2:20-CR-131-RMP<br><br>Motion to Dismiss Because § 1326<br>Violates the Fifth Amendment<br><br><br>Noted:<br>March 8, 2022 at 10:30 a.m.<br>Oral Argument Not Requested[1] |

*Racism is not just what is said or what is done, but also what is not said, what is disregarded, what is ignored, and what is willfully neglected.*

- Dr. Beyhan Farhadi

---

[1] No oral argument is requested because Mr. Cortez-Mendoza recognizes this precise issue was recently heard before the Court in February 2022, all of the arguments herein were also made in that case, and the transcript of the expert testimony and argument is included as Exhibit Y. *See U.S. v. Munoz-De La O*, 2:20-CR-134-RMP-1, 2022 WL 508892, at *11 (E.D. Wash. Feb. 18, 2022).

# Table of Contents

I.   Introduction ................................................................................................. 2

II.  Legal Background ......................................................................................... 4

III. Discussion .................................................................................................... 6

   A.  Section 1326 disparately impacts Latinxs........................................... 6

   B.  The 1929 Congress acted with a discriminatory purpose when it criminalized reentry under the Undesirable Aliens Act. ...................................................................... 7

     1.   The first factor (the law's historical background) shows a discriminatory purpose because the 1929 Congress relied on racist theories of eugenics. ......................................... 7

     2.   The second factor (events leading up to the law) shows a discriminatory purpose because reentry's criminalization was a compromise between nativists and industry. .......... 9

     3.   The third factor (legislative history) shows a discriminatory purpose because legislators used racist language.................................................................................. 14

     4.   The fourth factor (deviations from procedural norms) shows a discriminatory purpose because Congress relied on eugenics and racial vitriol.......................................... 15

   C.  The 1952 recodification did not cleanse the unlawful reentry statute of its racist origins. ........................................................................................................ 17

   D.  The 1952 Congress acted with a discriminatory purpose when it recodified the provision of the Undesirable Aliens Act criminalizing reentry. ....................................... 21

     1.   The first factor (the law's historical background) shows a discriminatory purpose because the racism of 1929 had not dissipated in 1952. ....................................... 21

     2.   The second factor (events leading up to the law) shows a discriminatory purpose because the 1952 Congress passed related legislation using racial slurs............................ 26

     3.   The third factor (legislative history) shows a discriminatory purpose because the 1952 Congress overturned a presidential veto calling out the INA's racism................................ 27

     4.   The fourth factor (deviations from procedural norms) shows a discriminatory purpose because the 1952 Congress knew about §1326's racist origins—and said nothing............. 29

   E.  As Mr. Cortez-Mendoza has demonstrated disparate impact and discriminatory purpose, the burden shifts to the government................................................................ 32

IV.  Conclusion.................................................................................................. 34

# I.    INTRODUCTION

The United States accuses Obet Cortez-Mendoza of violating 8 U.S.C. § 1326; a law that has been held by the District of Nevada to be unconstitutional. *See U.S. v. Carrillo-Lopez*, --- F.Supp.3d ----, 2021 WL 3667330 (D. Nev. Aug. 18, 2021). Mr. Cortez-Mendoza was brought to the United States by his family when he approximately 11 years old and has been a member of our community for over two decades. His alleged crime is returning home to his family (including U.S. citizens) in America after being issued three "expedited removals."[2] He has negligible criminal history, is not a flight risk, and poses no community danger, so he was placed on pretrial release on September 28, 2020.[3] He has now been on pretrial release for almost a year and a half with no violations.[4] Like the 99.1% of individuals convicted under 8 U.S.C. § 1326 in 2020, Mr. Cortez-Mendoza would fall in the U.S. Sentencing Commission's "Hispanic" category.[5]

This Court recognizes that statistics "easily" demonstrate Latinxs are disproportionately impacted by the enforcement and prosecution of 8 U.S.C. § 1326. *See U.S. v. Munoz-De La O*, 2:20-CR-134-RMP-1, 2022 WL 508892, at *11 (E.D.

---

[2] *See* ECF No. 22.
[3] *See* ECF Nos. 16, 17.
[4] *Id.*
[5] *See* U.S. Sentencing Commission, Quick Facts, Illegal Reentry Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf (last visited February 28, 2022).

Motion to Dismiss

Wash. Feb. 18, 2022). The illegal reentry law violates the Fifth Amendment's guarantee of equal protection because racism motivated Congress to criminalize reentry and the law continues to disparately impact Latinxs. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–68 (1977). Extensive expert opinion from Professor Kelly Lytle Hernández,[6] Professor Benjamin Gonzalez O'Brien,[7] and Professor Deborah S. Kang[8] is before the Court in support of the notion that Congress was at least motivated in part by a discriminatory purpose.[9] Dr. Kang describes the racial animus as "profound."[10] Notably, the government did not provide contravening expert testimony or opinion at the January 28, 2022 hearing on Mr. Munoz-De La O's Motion to Dismiss based on these same grounds.[11] Under *Arlington Heights* the government must then carry a burden it cannot meet: to show that Congress would have enacted the unlawful reentry statute but for its discriminatory purpose.[12]  The *Carrillo-Lopez* court held "Section 1326 violates the

---

[6] Professor Lytle Hernández is the Tom Lifka Endowed Chair in History at the University of California at Los Angeles and a 2019 John D. and Catherine T. MacArthur Fellow. *See* Ex. A (Professor Lytle Hernández CV).

[7] Professor Gonzalez O'Brien is an Associate Professor of Political Science at San Diego State University. *See* Ex. B (Professor Gonzalez O'Brien CV).

[8] Professor Deborah S. Kang is an Associate Professor in the Department of History at the University of Virginia. *See* Exs. R, S, T, U, V, W, X, Y.

[9] Discriminatory purpose need only be "**a** motivating factor" to prove Congress's discriminatory purpose. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270-71 (1977) (emphasis added); *see also* n.21.

[10] *See* Ex. S at 102.

[11] *See* Ex. Y.

[12] *Id.*

Motion to Dismiss

– 3 –

1  Equal Protection Clause of the Fifth Amendment" and dismissed the indictment

2  against Mr. Carillo-Lopez on that basis. *See U.S. v. Carrillo-Lopez*, --- F.Supp.3d ----,

3  2021 WL 3667330 (D. Nev. Aug. 18, 2021). [13] We ask this Court do the same for Mr.

4  Cortez-Mendoza.

5              ## II.    LEGAL BACKGROUND

6          The Fifth Amendment provides that no person shall be "deprived of life,

7  liberty, or property, without due process of law." U.S. Const. amend. V. "The liberty

8  protected by the Fifth Amendment's Due Process Clause contains within it the

9  prohibition against denying to any person the equal protection of the laws." *U.S. v.*

10 *Windsor*, 570 U.S. 744, 774 (2013).

11         A facially-neutral law violates the Fifth Amendment's equal protection

12 guarantee if it has a racially disparate impact and the legislature was motivated to

13 enact the statute at least in part by a discriminatory purpose. *See Arlington Heights*,

14 429 U.S. at 265–68. Disparate impact is established where the law's impact "'bears

15 more heavily on one race than another.'" *Id.* at 266 (quoting *Washington v. Davis*, 426

16 U.S. 229, 242 (1976)). Establishing a discriminatory purpose "demands a sensitive

17 inquiry into such circumstantial and direct evidence of intent as may be available,"

18

19 [13] The defense has included as exhibits all evidence that was before the District of Nevada, including transcripts from the hearings at which Professor Lytle Hernández and Professor Gonzales O'Brien testified. *See* Ex. E. With this evidence before the Court, the defense does not request an evidentiary hearing.

and the Supreme Court has identified the following potential sources of such

evidence:

      1)  the "historical background of the decision;"

      2)  the "specific sequence of events leading to the challenged decision;"

      3)  the "legislative or administrative history;" and

      4)  any "[d]epartures from normal procedural sequence."

*Id.* at 265–68. These are referred to as the *Arlington Heights* factors. While not

"purporting to be exhaustive," these factors constitute the "proper inquiry in

determining whether racially discriminatory intent existed." *Arlington Heights*, 429

U.S. at 268.

      The threshold for satisfying these factors is low. Legislatures are rarely

"motivated solely by a single concern," so a challenger need not show the

legislature's actions "rested solely on racially discriminatory purposes." *Arlington

Heights*, 429 U.S. at 265–66. Rather, the required showing is limited to "proof that a

discriminatory purpose has been **a** motivating factor in the decision." *Id.* (emphasis

added). The standard for this showing is a preponderance of the evidence. *See Hunter

v. Underwood*, 471 U.S. 222, 225 (1985).

      Once a challenger satisfies the *Arlington Heights* test (i.e., demonstrates

disparate impact and establishes the law was motivated by **a** discriminatory purpose),

the burden shifts to the government to establish the legislature would have enacted

the law "even had the impermissible purpose not been considered." *Id.* at 270 n. 21. If

the government cannot carry this burden, the challenged law violates the Fifth

Amendment and must be invalidated. *Id.*

## III. Discussion

**A.    Section 1326 disparately impacts Latinxs.**

Section 1326 meets *Arlington Heights'* test because it disparately impacts one

race (Latinxs) more than another. *See* 429 U.S. at 266. Ninety-eight percent of those

charged with illegal reentry in 2010 were from Latin America,[14] and over 99% of those

convicted of illegal reentry in 2020 were Hispanic.[15] In prior equal protection

challenges to § 1326, the government has not disputed the statute bears more heavily

on Latinxs—and courts have found the statute disparately impacts Latinxs. *See*

*Carrillo-Lopez* at *6–7; *U.S. v. Machic-Xiap*, --- F.Supp.3d ----, 2021 WL 3362738 at

*10 (D. Or. Aug. 3, 2021).

---

[14] Mark Motivans, *Immigration Offenders in the Federal Justice System, 2010*, U.S. Dep't of Just.: Bureau of Just. Stat. 22 (2013), available at https://bjs.ojp.gov/content/pub/pdf/iofjs10.pdf. This disparity is not unique to 2010. *See U.S. v. Machic-Xiap*, --- F.Supp.3d ----, 2021 WL 3362738 at *10 (D. Or. Aug. 3, 2021) (quoting Professor Lytle Hernández's testimony that "Latin-Mexican nationals" comprised between 85 and 99 percent of defendants in unlawful reentry prosecutions under the Undesirable Aliens Act and "the disparate impact upon Mexican and Latinos has not shifted" in the intervening decades, including after Congress enacted §1326).

[15] U.S. Sentencing Commission, Quick Facts, Illegal Reentry Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf.

**B.    The 1929 Congress acted with a discriminatory purpose when it criminalized reentry under the Undesirable Aliens Act.**

Racial animus was—at a minimum—a motivating factor in passing the Undesirable Aliens Act and its criminalization of reentry. *See Carrillo-Lopez* at *9 ("the Act of 1929 was passed during a time when nativism and eugenics were widely accepted, both in the country at large and by Congress, and … these racist theories ultimately fueled the Act's passage"); *Machic-Xiap* at *1 ("racism has permeated the official congressional debate over United States immigration laws since the late 19th and early 20th centuries, including the 1929 Act").

The evidence of racial animus is so overwhelming that the government has "conceded that discriminatory intent motivated the passage of the Act of 1929." *Carrillo-Lopez* at *7. Although it's undisputed that discriminatory intent motivated the Undesirable Aliens Act, it's nevertheless instructive to assess the *Arlington Heights* factors because the Act's background informs the recodification of the unlawful reentry portion of that law in 1952 as § 1326.

**1.    The first factor (the law's historical background) shows a discriminatory purpose because the 1929 Congress relied on racist theories of eugenics.**

Historians refer to the 1920s in the United States as the "Tribal Twenties." Following World War I, there was "a feverish sentiment against presumably disloyal

1    'hyphenated Americans.'"[16] Nativism and racial animus intensified, and the decade

2    saw the rebirth of the Ku Klux Klan, the coming of age of Jim Crow, and the growing

3    acceptance of eugenics (a faux science attributing biological significance to race).[17]

4    The *Saturday Evening Post* ran articles warning that new immigrants were racially

5    inferior, impossible to assimilate, and a threat to stability and democracy.[18] The leader

6    of a major scientific institution contended that neither education nor environment

7    could alter the "'profound and inborn racial differences' that rendered certain people

8    inferior."[19]

9        Fears of "non-white" immigration spurred the introduction of numerous

10   bills,[20] as nativist politicians aimed to "restrict and even end immigration to the

11   United States from every region of the world other than western Europe."[21] Congress

12   began the decade by passing the first numerical restriction on immigration,[22] and for

13   the rest of the decade legislators aimed for "America [to] cease to be the 'melting

14   pot.'"[23] Prominent proponents of immigration restrictions "spoke increasingly of

15

16   ───────────────

[16] Mae M. Ngai, *Impossible Subjects*, 19–20 (2004 William Chafe, et al.).

17   [17] Ex. C (Declaration of Professor Lytle Hernández) at 2.
[18] Jia Lynn Yang, *One Might and Irresistible Tide: The Epic Struggle Over American Immigration*, 8 (2020).

18   [19] Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America*, 3 (2019).

19   [20] *See generally* Okrent, *supra.*
[21] Ex. C (Declaration of Professor Lytle Hernández) at 2.
[22] Emergency Immigration Act of 1921, Pub. L. No. 67-5, 42 Stat. 5 (1921).
[23] Yang, *supra*, at 3 (quoting Senator David A. Reed).

1   'racial indigestion'" and "the 'contamination' of Anglo-American society.'" [24] Dr.

2   Harry Laughlin, a leading eugenicist well-known for his model sterilization law (which

3   would later serve as the template for Nazi Germany's sterilization law), testified

4   before Congress many times throughout the decade.[25]  Relying on such racist

5   theories, Congress would anchor its immigration law in eugenics throughout the

6   1920s.[26]

7           2.      **The second factor (events leading up to the law) shows a
                    discriminatory purpose because reentry's criminalization was a
8                   compromise between nativists and industry.**

9           Over 100 years ago, Congress began focusing legislation around the exclusion

10  of "undesirable" (i.e., non-white) immigrants.[27] The Wartime Measure Act of 1918

11  first vested authority in the President to restrict entry into the United States

12  "contrary to the public safety."[28] The National Origins Act of 1924 then narrowed

13  the pathways of legal immigration by establishing quotas based on national origin—

14  with 96% of all quota slots reserved for European immigrants.[29]

15

16  ---
    [24] Ngai, *supra*, at 23; Kelly Lytle Hernández, *Migra! A History of the U.S. Border Patrol*, 28 (2010).
17  [25] Ngai, *supra*, at 24; *Harry Laughlin and Eugenics*, Truman State University, available at
    https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/; Ex. D (*The
18  Eugenical Aspects of Deportation,* Hearings before the Committee on Immigration and
    Naturalization, House of Representative, 70th Cong., Hearing No. 70.1.4 (1928)) at 2, 3.
    [26] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).
19  [27] *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) ("the
    use of 'code words' may demonstrate discriminatory intent").
    [28] Pub. L. No. 65-154, 40 Stat. 599 (1918).
    [29] Ex. C (Declaration of Professor Lytle Hernández) at 3.
                                    Motion to Dismiss

1    There was, however, one loophole that infuriated nativists: American industry

2    (primarily agribusinesses in the southwest) successfully lobbied for the National

3    Origins Act to exempt immigrants from the Western hemisphere in order to ensure

4    continued access to cheap Mexican labor.[30] Nativists in Congress grumbled that the

5    bill "leaves open the doors for perhaps the worst element that comes into the United

6    States—the Mexican peon,"[31] and proposed numerous bills aimed at ending Mexican

7    immigration.[32] The two major attempts came in 1926 and 1928, but "major employers

8    and industries across the west" successfully opposed the bills due to "concern[] that

9    they w[ould] be cut off from access to Mexican workers."[33]

10    In the face of insurmountable industry opposition, nativists in Congress sought

11    a compromise with industry: rather than preventing immigration, they would

12    criminalize it after the fact. This compromise was the brainchild of Secretary of Labor

13    James Davis and Senator Coleman Blease of South Carolina.[34] (Secretary Davis was a

14    believer in eugenics and warned about the "rat type" and "rat men" coming to the

15    United States and jeopardizing the Anglo-American gene pool;[35] Senator Blease was a

16

17    [30] Ex. C (Declaration of Professor Lytle Hernández) at 3; *see* Hans P. Vought, *The Bully Pulpit*, 179 (2004).

       [31] Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).

18    [32] Ex. C (Declaration of Professor Lytle Hernández) at 5.

       [33] Ex. E (Testimony of Professor Lytle Hernández) at 28–30.

19    [34] Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), available at https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.

       [35] Vought, *supra*, at 174–79.

1  devout racist and suspected Klan member.[36]) Secretary Davis was torn between his

2  racist desire to protect the American gene pool and his responsibility to maintain a

3  large labor supply for American industry—he reasoned this compromise would allow

4  authorities to expel Mexicans after growing season, thereby avoiding industry

5  resistance.[37] He was onto something, as one influential farmer and lobbyist explained

6  to Congress: "We, in California, would greatly prefer some set up in which our peak

7  labor demands might be met and upon the completion of our harvest these laborers

8  returned to their country."[38]

9        To bring their plan to fruition, Secretary Davis and Senator Blease collaborated

10  with two powerful members of the House Immigration and Naturalization

11  Committee: Representatives Albert Johnson of Washington and John Box of Texas.

12  Johnson, the Chairman of the Committee, headed the Eugenics Research Association,

13  which supported forced sterilizations.[39] He viewed the "fundamental reason" for

14  immigration restrictions to be "biological," seeking to exclude the "Mexican race."[40]

15  Box viewed the "Mexican peon" as "a mixture of Mediterranean-blooded Spanish

16

17  [36] *See* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, at 57–86 (Feb. 1996), *available at*

18  http://www.jstor.com/stable/2211206.
   [37] Vought, *supra*, at 216; MacDougall.

19  [38] Ex. C (Declaration of Professor Lytle Hernández) at 7.
   [39] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, at 242–43 (2002).
   [40] Okrent, *supra*, at 3

peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs."[41] He saw Mexicans as "essentially different from us in character, in social position," and viewed the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization."[42] Other legislators warned that Mexicans "composed of mixtured blood of White, Indian, and negro" were "pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises," that "their blood" would be "a very great penalty upon the society which assimilates it," and that "their amalgamation with our people will cause a general weakening, physically and mentally, of our civilization."[43]

Chairman Johnson had previously convened hearings on immigration. At one hearing, he admitted into the record a letter from a constituent urging legislators to keep out "the scoff and scum, the mongrel, the bootlegger element from Mexico."[44] At another hearing, the principal witness was Dr. Laughlin (the prominent eugenicist).[45] Chairman Johnson praised Dr. Laughlin's report as a "priceless"

---

[41] Ex. F (Congressional Record, Feb. 9, 1928) at H2817–18.
[42] Ex. G (Congressional Record, Feb. 16, 1929) at H3619; Ex. F (Congressional Record, Feb. 9, 1928) at H2817–18.
[43] Ex. H (Congressional Record, Feb. 3, 1928) at H2462.
[44] Ex. I (*Deportation*, Hearings Before the Committee on Immigration and Naturalization, House of Representatives, 69th Cong., Hearing 69.1.3 (1926)) at 30.
[45] Ex. D (*The Eugenical Aspects of Deportation,* Hearings before the Committee on Immigration and Naturalization, House of Representative, 70th Cong., Hearing No. 70.1.4 (1928)) at 1.

1    resource that would "bear intimately on immigration policy."[46] Dr. Laughlin went on

2    to testify about "protect[ing] American blood from alien contamination," and

3    contended that "[i]mmigration control is the greatest instrument which the Federal

4    Government can use in promoting race conservation of the Nation."[47] He compared

5    the drafters of deportation laws to "successful breeders of thoroughbred horses" and

6    advocated deportation of the "undesirable individual," because otherwise "we

7    cannot get rid of his blood no matter how inferior it may be, because we cannot deport

8    his offspring born here."[48] Finally, he predicted that so long as the border remained

9    open to immigrants, "there will always be need for deportation, or the 'final

10   selection.'"[49]

11       Chairman Johnson agreed that "[i]mmigration looks more and more like a

12   biological problem, and if the work of this committee results in establishing this

13   principle in our immigration policy we will be well repaid for our efforts."[50] He

14   advocated for Congress's use of the "principle of applied eugenics" to "do

15   everything possible" by "debarring and deporting" more people.[51]

16

17   [46] Ex. D at 3.
     [47] Ex. D at 3, 19.
18   [48] Ex. D at 44–45. This was not the only instance of comparing ethnicities to breeds of animals.
     Representative Patrick O'Sullivan criticized restrictions on Italian immigrants, stating that "the
     average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a
19   mongrel." Ex. J (Congressional Record, Apr. 8, 1924) at H5900.
     [49] Ex. D at 44.
     [50] Ex. D at 46.
     [51] Ex. D at 25.

In this spirit of "applied eugenics," nativists in Congress set to work criminalizing reentry.

### 3. The third factor (legislative history) shows a discriminatory purpose because legislators used racist language.

The compromise between nativists and industry was formalized on January 18, 1929, when Senator Blease submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully," along with a letter from Secretary Davis advocating passage of the law.[52] The following week, Senator Blease presented the bill on the Senate floor and reported that Chairman Johnson had "asked [him] to get the measures over to the House [within two days]."[53] The Senate passed the bill.[54]

Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the law.[55] That report noted that "the hearings in the Sixty-ninth Congress on the subject matter contained in the bill were exhaustive," and "[m]uch important testimony was developed."[56] During the debate in the House, representatives made racist remarks,

---

[52] Ex. K (S. Rep. No. 1456, Jan. 17, 1929) at 1–2.
[53] Ex. L (Congressional Record, Jan. 23, 1929) at S2092.
[54] Ex. L at S2092.
[55] Ex. M (H. Rep. No. 2397, Feb. 6, 1929).
[56] Ex. M (S. Rep. No. 2397 (1929)) at 2.

Motion to Dismiss

– 14 –

including that Mexicans were a "very undesirable" class that was "poisoning the American citizen."[57] The bill passed the House, and the president signed it into law three days later.[58]

> **4.    The fourth factor (deviations from procedural norms) shows a discriminatory purpose because Congress relied on eugenics and racial vitriol.**

Examining whether the legislature departed from "normal procedures or substantive conclusions" requires courts to consider any "procedural irregularities" leading up to the enactment of a law,[59] as well as any illogical or counter-intuitive conclusions in the decision-making process.[60]

Here, the numerous overtly racist statements from legislators demonstrate that Congress departed from normal procedures and substantive conclusions. The 1920s were the first and only era in which Congress openly relied on eugenics when passing legislation, and the Undesirable Aliens Act was driven by views of immigration control as a means of racial engineering akin to horse breeding. It is noteworthy that the racial vitriol expressed during the debates was directed almost exclusively at Mexicans, even though Canadians were also entering the United States in record

---

[57] Ex. G (Congressional Record, Feb. 16, 1929) at H3620.
[58] Ex. N (Pub. L. No. 1018, Mar. 4, 1929).
[59] *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013).
[60] *See, e.g., Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's decision to "disregard the zoning advice of its own experts").

numbers.[61] No legislator referred to Canadians as "mongrels" or complained that Canadians were "poisoning the American citizen."[62]

*                *                *

This record demonstrates that racial animus was a motivating factor in the passage of the Undesirable Alien Act. As Professor Lytle Hernández testified, "the illegal reentry provision of the 1929 law was intended to target Latinos."[63] For this reason, Judge Du found that "racial animus was a strong motivating factor in the passage of the Act of 1929." *Carrillo-Lopez* at *9; *see also Machic-Xiap* at *12 (characterizing the Undesirable Aliens Act as "serv[ing] two racist purposes"—it "furthered nativists' desire to separate certain immigrants from the general population by attaching criminal penalties like imprisonment" while at the same time giving "southwestern agribusiness greater ability to exploit these immigrants" by allowing farmers to use "the threat of deportation as leverage over this immigrant labor").

In short, Congress was motivated by racial animus when it enacted the Undesirable Alien Act and criminalized reentry.

---

[61] Ex. G (Congressional Record, Feb. 16, 1929) at H3621 (stating that 81,506 Canadians entered the U.S. in 1928).

[62] *See* Ex. I (*Deportation*, Hearings Before the Committee on Immigration and Naturalization, House of Representatives, 69th Cong., Hearing 69.1.3 (1926)) at 30; Ex. G (Congressional Record, Feb. 16, 1929) at H3620.

[63] Ex. E (Testimony of Professor Lytle Hernández) at 34.

Motion to Dismiss

– 16 –

**C.    The 1952 recodification did not cleanse the unlawful reentry statute of its racist origins.**

When Congress passed the INA in 1952, it recodified the Undesirable Alien Act's criminalization of reentry at 8 U.S.C. § 1326. Section 1326 adopted the language from the Undesirable Alien Act "almost word for word," *Carrillo-Lopez* at *7, while other portions of the INA broadened the grounds for deportation and limited discretionary relief from deportation. President Truman harshly criticized the INA, noting it was "most unfortunate" that the bill "would impose harsher restrictions and greatly increase the number of cases deserving equitable relief" while at the same time "narrow[ing] the circle of those who can obtain relief from the letter of the law."[64]

The 1952 Congress was aware of the disparate impact the criminalization of reentry had on Latinxs, and it was aware of its racist underpinnings—but it engaged with neither and overrode President Truman's veto, which explicitly called out the law's discriminatory intent. The only meaningful change Congress made to the statute was expanding it (at the behest of Deputy Attorney General Payton Ford, who included the racial slur "wetback" in his request) to cover those who—like Mr. Muñoz—are "found in" the United States. *See* 8 U.S.C. § 1326(a)(2).

Recodification does not automatically reset legislative intent. While it's possible for recodification of a racially-motivated law to cure the original law's

---

[64] Ex. O (President Truman's statement on "Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality," June 25, 1952) at 9.

1    discriminatory intent, that happens only where the legislature actively engages with

2    the prior statue and makes substantive changes. *See Abbott v. Perez*, 138 S. Ct. 2305

3    (2018).

4        This intuitive understanding of legislative intent is reflected in Supreme Court

5    case law: "It will not be inferred that the legislature, in revising and consolidating the

6    laws, intended to change their policy, unless such intention be clearly expressed."

7    *U.S. v. Ryder*, 110 U.S. 729, 740 (1884). "[W]e do not presume that the revision

8    worked a change in the underlying substantive law unless an intent to make such a

9    change is clearly expressed." *Keene Corp. v. U.S.*, 508 U.S. 200, 209 (1993) (cleaned

10   up).

11       As Judge Du noted in *Carrillo-Lopez*, "a prior version of a statute known to be

12   motivated by racial animus may be considered as infecting its present iteration if it was

13   not, in fact, substantially altered." *Id.* at *10 (citing *Hunter v. Underwood*, 471 U.S.

14   222, 232–33 (1985) (finding that when a provision's original enactment was clearly

15   motivated by racial animus, later changes did not "legitimate[]" the provision); *see*

16   *also Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (Sotomayor, J., concurring) (noting that

17   "many laws and policies in this country have had some history of racial animus" and

18   citing to *U.S. v. Fordice*, 505 U.S. 717, 729 (1992) for the proposition that "policies

19   that are 'traceable' to a State's *de jure* racial segregation and that still 'have

     discriminatory effects' offend the Equal Protection Clause).

Motion to Dismiss
– 18 –

1    While the Supreme Court upheld the recodification of a racially-discriminatory

2  law in *Abbott*, it did so only because the legislature actively engaged with the prior

3  statute and made substantive changes. The Supreme Court upheld a 2013

4  redistricting plan that replaced a 2011 plan after the 2011 plan was found to have been

5  enacted with discriminatory intent. The crucial distinction here is that, in *Abbott*, the

6  2013 legislature enacted an entirely new redistricting plan explicitly created to "fix the

7  problems identified" (i.e., the discriminatory intent behind the 2011 plan), 138 S. Ct.

8  at 2329, whereas § 1326 was nearly identical to the original unlawful reentry statute.

9    The Supreme Court made clear in *Abbott* that the legislature's original intent

10  remains relevant to determining the intent of the reenacting legislature "to the extent

11  that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding the intent

12  of the" reenacting legislature. *Id.* at 2327.[65]  In that particular case, the Supreme

13  Court found the reenacting legislature lacked discriminatory intent precisely because

14  of the way that it responded to the challenged provision, i.e., the fact that the 2013

15

16

_____

[65] To the extent *Abbott* suggests any kind of presumption of a legislature's good faith, such
presumption is limited to redistricting cases. *See Abbott*, 138 S. Ct. at 2324 ("'in assessing the
sufficiency of a challenge ***to a districting plan***,' a court 'must be sensitive to the complex
interplay of forces that enter a legislature's redistricting calculus' … [a]nd the 'good faith of the
legislature must be presumed'" (citing *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995) (emphasis
added)). As Judge Du notes, both *Abbott* and *Miller* justify this presumption on the complexity of
redistricting—and there is no reason to believe such a presumption would carry over to a less
complex statutory scheme, particularly where it has been shown that the original legislation was
motivated by racial animus and the reenacting legislation is nearly identical. *Carrillo-Lopez* at *10
n.21.

Motion to Dismiss

– 19 –

1   legislature had taken care "'not to incorporate … any legal defects'" from the 2011

2   plan. *Abbott* at 2325 (quoting *Perry v. Perez*, 565 U.S. 388, 394 (2012)). In so doing, the

3   Supreme Court stressed that the legislature "did not reenact the plan previously

4   passed by its 2011 predecessor" and therefore had not "carried forward the effects of

5   any discriminatory intent on the part of the 2011 Legislature." *Id.* The Supreme Court

6   concluded: "***Under these circumstances,*** there can be no doubt about what matters: It

7   is the intent of the 2013 Legislature." *Id.* (emphasis added).

8        With regard to § 1326, the 1952 Congress—unlike the legislature in *Abbott*—did

9   not engage with the disparate impact or discriminatory purpose behind the original

10  legislation. Rather, it recodified a racist law without debate, altering it only to make it

11  more punitive, and knowingly "carried forward the effects" of the Act's

12  discriminatory intent (i.e., the disparate impact on Latinxs).

13       *Abbott* does not shield reenacting legislation from scrutiny where the legislature

14  passes a nearly-identical law without acknowledging, much less addressing, the prior

15  legislation's discriminatory motive or disparate effect. When Congress carries forward

16  legislation that was motivated by racial animus and has produced racially-disparate

17  results (and does so over a presidential veto explicitly calling out the racism of the

18  legislation), it takes no mental gymnastics to find that racial animus remained a

19  motivating factor.

1    The 1952 Congress's recodification of the Undesirable Aliens Act's unlawful

2    reentry statute—without debate on (and with full knowledge of) the statute's

3    discriminatory intent and disparate impact—establishes discriminatory intent under

4    *Arlington Heights*.[66]

5    **D.    The 1952 Congress acted with a discriminatory purpose when it recodified the provision of the Undesirable Aliens Act criminalizing reentry.**

6    In addition to the failure to address (much less repudiate) the discriminatory

7    intent behind the original unlawful reentry statute, there is significant

8    contemporaneous evidence that the 1952 Congress itself acted with discriminatory

9    intent in recodifying that statute. Applying the *Arlington Heights* factors to the 1952

10    recodification of § 1326, it's clear racial animus was a motivating factor.

11    **1.    The first factor (the law's historical background) shows a discriminatory purpose because the racism of 1929 had not dissipated in 1952.**

13    The racial animus underpinning the Undesirable Aliens Act of 1929 informs

14    the 1952 Congress's recodification of the unlawful reentry provision. In *Carrillo-*

15    *Lopez*, Judge Du rightly "incorporate[d] by reference this prior evidence as evidence

16    of the historical background motivating the passage of Section 1326 in 1952." *Id.* at *9.

17

18

19

---

[66] In *Carrillo-Lopez*, Judge Du suggested, without deciding, that she "might be persuaded that the 1952 Congress' silence alone is evidence of a failure to repudiate a racially discriminatory taint." *Id.* at *9.

The anti-Latinx racism that motivated Congress in 1929 did not dissipate over the years leading up to the passage of the INA in 1952. White supremacy was alive and well throughout this time. Schools were segregated, *see, e.g., Westminster Sch. Dist. Of Orange Cty. v. Mendez*, 161 F.2d 774, 781 (9th Cir. 1947) (holding that the "segregation of school children of Mexican descent" violated the Fourteenth Amendment), and anti-miscegenation laws were on the books in numerous states, *see Loving v. Virginia*, 388 U.S. 1, 7 (1967) (noting a state court had, in 1955, upheld an anti-miscegenation law as "an endorsement of the doctrine of White Supremacy" and an attempt to prevent "a mongrel breed of citizens").

Between 1929 and 1952, there were two major historical events bearing on the Latinx population: the "repatriation drives" of the Great Depression and the subsequent "Bracero Program." Both events demonstrate the United States' intent to prevent Latinxs' permanent settlement and to maintain control over a temporary and exploitable Latinx workforce.

The so-called "repatriation drives" carried out during the Great Depression amounted to a government-led campaign of intimidation and coercion against the Latinx population in the United States. As Professor Gonzalez O'Brien testified, "this was a campaign that was meant to fuel voluntary re-patronization … driven by a sense of the threat of deportation or the threat of additional penalties if those

1  individuals did not return to Mexico."[67] The campaign achieved its purpose, driving

2  millions of Latinxs—many, if not most, of whom were U.S. citizens—out of the

3  United States. California has since apologized to the "estimated two million people of

4  Mexican ancestry [who] were forcibly relocated to Mexico, approximately 1.2 million

5  of whom had been born in the United States."[68]

6        Not long after this mass expulsion of Latinxs, the United States entered World

7  War II, finding itself in need of cheap labor. In 1942, the United States started the

8  Mexican Farm Labor Program, also known as "Operation Bracero" or the "Bracero

9  Program." The idea was to funnel Latinx labor into the United States on a legal and

10 temporary basis, while ensuring decent wages and humane treatment for the laborers.

11 But the reality was that Braceros were lured to the United States only to be brutalized.

12 They were subjected to medical inspections that required them to strip naked and

13 involved invasive inspections and "being gassed systematically with DDT."[69]  The

14 protections they were promised were routinely ignored.[70] They were exploited and

15 subjected to literally back-breaking labor precisely because of their race. As Professor

16

17 [67] Ex. E (Testimony of Professor Gonzalez O'Brien) at 87.

18 [68] California Apology Act for the 1930s Mexican Repatriation Program (effective January 1,
2006), available at

19 https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=GOV&division=1.&
title=2.&part=&chapter=8.5.&article= (last visited February 28, 2022).
[69] Ex. E (Testimony of Professor Lytle Hernández) at 76–77.
[70] Ex. E (Testimony of Professor Lytle Hernández) at 78.

Motion to Dismiss
– 23 –

1  Lytle Hernández testified, the Braceros were mistreated because of the stereotype

2  "that they, as a racial group, um, were more stout and close to the ground and sort of

3  fit for this kind of labor, and so they didn't need the accoutrement that others did." [71]

4  When they were no longer needed, they were sent back to Mexico. [72]

5       Both the "repatriation drives" of the Great Depression and the subsequent

6  "Bracero Program" demonstrate that anti-Latinx racism remained prevalent in the

7  years leading up to the passage of the INA in 1952. This history of racism manifested

8  itself in countless other ways over the years, including the 1943 Sleepy Lagoon Trial in

9  Los Angeles (a mass murder trial of 22 Latinx defendants, during which a sheriff's

10  captain testified that "the Mexican element" had an innate "desire to use a knife or

11  some other lethal weapon … his desire is to kill, or, at least, let blood") and the

12  subsequent Zoot Suit Riots (10 days during which mobs of U.S. servicemen in Los

13  Angeles took to the streets and beat Latinx youths with impunity). [73]

14       This anti-Latinx racism remained prevalent in 1952, as evidenced by

15  Congress's passage of Senate Bill 1851 (the so-called "Wetback Bill") that year. This

16

---

17  [71] Ex. E (Testimony of Professor Lytle Hernández) at 78.

[72] In 1948, a plane returning Braceros to Mexico crashed in central California, killing all of the
100 people onboard. News accounts gave the names of the crew and an immigration officer—and

18  listed the others simply as "deportees." *Passengers on doomed 1948 flight, their names now emerge from shadows*, Los Angeles Times (July 10, 2013), available at https://www.latimes.com/local/la-me-deportees-guthrie-20130710-dto-htmlstory.html.

19  [73] *See Zoot Suit Riots: After 75 years, L.A. looks back on a violent summer*, Los Angeles Times (June 4, 2018), available at https://www.latimes.com/local/lanow/la-me-ln-zoot-suit-riots-anniversary-20180604-story.html.

1  bill's passage is particularly probative for two reasons: first, it was passed by the same

2  Congress that, just two months later, would recodify the unlawful reentry provision of

3  the Undesirable Aliens Act; and second, it shared the aim of preventing unlawful

4  immigration (its stated purpose was to "assist in preventing aliens from entering or

5  remaining in the United States illegally.").[74]

6      The 1952 Congress's debate and passage of the Wetback Bill is relevant

7  historical background demonstrating the open racism of the legislature that would

8  enact § 1326 only two months later. As Professor Gonzalez O'Brien testified,

9  "throughout the debate [on the bill], Mexican undocumented entrants [were]

10  regularly referenced as wetbacks," the debate focused on the "wetback problem,"

11  and legislators suggested that individuals "may be criminals because they are

12  wetbacks."[75] The fact that the 1952 Congress openly used the racial slur "wetback"

13  to refer to Mexicans—while debating the "Wetback Bill"—is illustrative of the open

14  racial animus of the 1952 Congress.

15      Professor Gonzalez O'Brien testified that the "term 'wetback' is one that is

16  racially derogatory, was recognized as being racially derogatory at the time," and

17  "across the period of the 1940s and 1950s [was] associated … almost synonymous

18  with Mexicans."[76] "[W]hile the use of racial slurs, epithets, or other derogatory

19

[74] Pub. L. No. 82-283, 66 Stat. 26 (1952).
[75] Ex. E (Testimony of Professor Gonzalez O'Brien) at 97–98, 107.
[76] Ex. E (Testimony of Professor Gonzalez O'Brien) at 89.

Motion to Dismiss

language does not alone prove discriminatory intent, it is evidence that official action may be motivated by such an unlawful purpose." *La Union del Pueblo Entero v. Ross*, 353 F. Supp.3d 381, 395 (D. Md. 2018). As Judge Du found in *Carrillo-Lopez*, the use of the term "wetback" "evidences the racial environment and rhetoric in 1952, even among high-ranking government officials and committees, specifically with regard to Mexican and Latinx people." *Id.* at *13.

> **2.    The second factor (events leading up to the law) shows a discriminatory purpose because the 1952 Congress passed related legislation using racial slurs.**

The specific sequence of events leading to the 1952 Congress's recodification of the Undesirable Aliens Act's unlawful reentry provision is troubling for two reasons. First, the same Congress passed the "Wetback Bill" two months prior. Second, Deputy Attorney General Peyton Ford wrote to the Chairman of the Committee on the Judiciary on behalf of the Department of Justice, included the racial slur "wetback," and requested the one and only substantive change to the statute— the expansion of the law to cover those "found in" the United States.[77] As the letter makes clear, this change was expressly designed to make it easier for the government to establish venue in criminal prosecutions.[78]

---

[77] Ex. P (Statement of Peyton Ford, Deputy Attorney General, May 14, 1951).
[78] Ex. P at 6 ("This change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act.").

1    Deputy Attorney General Ford was not some fringe figure shooting off a letter

2  to his representative. He was the second-highest-ranking Department of Justice

3  official and was providing "the views of the Department of Justice."[79] Based on his

4  request alone (the congressional record does not appear to contain any other

5  comment on what is now § 1326), the 1952 Congress expanded the unlawful reentry

6  statute so that venue would lie wherever a reentering immigrant was found. (But for

7  this expansion, the government would have no grounds to prosecute Mr. Cortez-

8  Mendoza in this district.)

9    As Judge Du found in *Carrillo-Lopez*, this sequence of events demonstrates that

10  "[t]he 1952 Congress's silence does not evince a neutral viewpoint, but worked to

11  expand the enforceability of an admittedly racist law." *Id.* at *14.

12    **3.    The third factor (legislative history) shows a discriminatory
         purpose because the 1952 Congress overturned a presidential veto
13         calling out the INA's racism.**

14    The 1952 Congress's racial animus is demonstrated by its overriding of

15  President Truman's veto of the INA, which explicitly called out the racism of the Act.

16    On June 25, 1952, President Truman vetoed the INA and issued a veto

17  statement.[80] He condemned the INA as "legislation which would perpetuate

18  injustices of long standing" and "intensify the repressive and inhumane aspects of our

19

---

[79] Ex. P at 1.

[80] Ex. O (President Truman's statement on "Veto of Bill to Revise the Laws Relating to
Immigration, Naturalization, and Nationality," June 25, 1952).

Motion to Dismiss

– 27 –

immigration procedures."[81] He expressed dismay that so much of the INA "would

continue, practically without change" discriminatory immigration laws.[82] He

admonished that it was "the time to shake off this dead weight of past mistakes …

time to develop a decent policy of immigration … and a true reflection of the ideals we

stand for, at home and abroad."[83]

Two days after President Truman's statement, Congress overrode the veto and

passed the INA.

Congress's passage of the INA over a presidential veto explicitly calling out the

law for its racism is evidence of racial animus. As Judge Du found in *Carrillo-Lopez*,

"Congress' failure to heed President Truman's call to 'reimagine' immigration while

simultaneously making the INA, and particularly Section 1326, more punitive in

nature, is evidence of at least indifference to the nativist motivations of the statute's

predecessor." *Id.* at *12. As Desmond Tutu once said, "[i]f you are neutral in

situations of injustice, you have chosen the side of the oppressor." The 1952

Congress's choice of inaction under these circumstances shows its complacency with

long-standing racial animus that was widely accepted.

---

[81] Ex. O at 3.
[82] Ex. O at 4.
[83] Ex. O at 6.

1    **4.    The fourth factor (deviations from procedural norms) shows a
2    discriminatory purpose because the 1952 Congress knew about
     §1326's racist origins—and said nothing.**

3    As noted above, examining whether the legislature departed from "normal

4    procedures or substantive conclusions" requires courts to consider any procedural

5    irregularities leading up to the enactment of a law, as well as any illogical or counter-

6    intuitive conclusions in the decision-making process.

7    Here, there were three such departures:

8    First, Congress's passage of the "Wetback Bill" (two months prior to re-

9    codifying the unlawful reentry statute) represents an illogical and counter-intuitive

10   irregularity leading up to the enactment of § 1326. This is because of the incongruity

11   between the stated intent of the "Wetback Bill" and Congress's actual intent, as

12   demonstrated by the language of the statute. While the bill's stated aim was to

13   prevent "aliens from entering or remaining in the United States illegally," the law

14   worked to shield employers from prosecution ("for the purposes of this section,

15   employment … shall not constitute harboring").[84] It was obvious then as now that the

16   lure of employment was the primary reason Latinxs were coming to the United States

17   unlawfully. For many reasons, employers are vastly more responsive to deterrence

18   than impoverished immigrants, and the most effective means of deterring "aliens

19   from entering or remaining in the United States illegally" is therefore to punish

---

[84] Pub. L. No. 82-283, 66 Stat. 26 (1952).

1  employers who hire such immigrants. The import here is that the 1952 Congress,

2  despite its avowed interest in limiting unlawful immigration, was in fact furthering the

3  racist compromise introduced by the 1929 Congress: preserving American industry's

4  access to cheap and exploitable Latinx labor while punishing the Latinxs who provided

5  that labor. The stated intent did not align with the actual intent and impact at all. As

6  Judge Du found in *Carrillo-Lopez*, the 1952 Congress's "criminalization of Mexican

7  immigrant laborers while shielding employers evidences the racially discriminatory

8  motives and intent of the same Congress who enacted Section 1326 only two months

9  later." *Id.* at *15.

10  Second, the 1952 Congress's decision to expand the reach of the unlawful

11  reentry statute based on a letter from the Deputy Attorney General that referred to

12  Mexicans as "wetbacks" is procedurally irregular and evidences racial animus.

13  Third, the 1952 Congress's lack of debate regarding § 1326, when Congress

14  knew of the law's disparate impact on Latinxs and when other provisions of the INA

15  were discussed and debated at length, is an irregularity demonstrating Congress's

16  discriminatory intent. This is particularly the case given that the 1952 Congress

17  expanded the grounds for deportation, restricted discretionary relief from

18  deportation, and expanded the scope of the unlawful reentry provision. As Professor

19  Gonzalez O'Brien testified, the lack of discussion of the unlawful reentry provision of

the INA suggests an acceptance of its racist history.[85] Explicit discrimination need not be repeated to be understood through a silent acceptance and the use of "proxies" to talk about racist sentiments (as referenced by Dr. Kang).[86] The 1952 Congress had full knowledge of the unlawful reentry statute's disparate impact, as Mexicans comprised up to 99% of the tens of thousands of individuals prosecuted and convicted in the years following the law's passage.[87] Despite having every opportunity to examine the unlawful reentry provision's history and clarify it was re-codifying that provision for a legitimate, non-discriminatory purpose, the 1952 Congress ignored the express racism behind the original statute and its disparate impact on Latinxs. As Judge Du found in *Carrillo-Lopez*, "[w]hen considered in comparison with the express debate over other racially problematic predecessor statutes, Congress' silence here weighs in favor or establishing" the 1952 Congress was motivated by racial animus—particularly given "its decision to expand the grounds for deportation and carceral punishment, despite its knowledge of the disparate impact of this provision on Mexican and Latinx people." *Id.* at *11, 15.

*            *            *

---

[85] Ex. E (Testimony of Professor Gonzalez O'Brien) at 181.
[86] *See* Ex. Y at 51–52.
[87] Hernández, *supra*, at 138–39 n.6 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years 1931–36); Ex. C (Declaration of Professor Lytle Hernández) at 8. *See also* Ex. Q (S. Rep. No. 1515, Apr. 20, 1950) at 654–56 (regarding testimony from the Immigration and Naturalization Service that refers exclusively to Mexicans and recommends carrying forward the1929 legislation).

1   When the 1952 Congress recodified the Undesirable Aliens Act's unlawful

2   reentry statute at 8 U.S.C. § 1326, it chose to ignore the original statute's racist

3   history and to expand a law it knew disparately impacted Latinxs. In so doing, the

4   1952 Congress was motivated at least in part by racial animus. As Professor Gonzalez

5   O'Brien testified, Congress's passage of § 1326 "was largely driven by the same

6   things that drove the original codification of [the unlawful reentry statute]; and that

7   was, in part, a desire to control access to Mexican labor, and also a tendency to view

8   Mexicans, individuals from south of the Rio Grande, and at least in the terms of the

9   1950s, the wetback, as a problematic population" — leading Professor Gonzalez

10   O'Brien to give his professional opinion that the 1952 Congress's recodification of the

11   unlawful reentry statute was "motivated by racial animus."[88]

12       For these reasons, Judge Du rightly concluded "the totality of the evidence

13   shows that the same factors motivating the passage of [the unlawful reentry statute] in

14   1929 were present in 1952" — meaning, "racial animus was at least one motivating

15   factor behind the enactment of Section 1326." *Carrillo-Lopez* at *10, 16.

16   **E.    As Mr. Cortez-Mendoza has demonstrated disparate impact and
             discriminatory purpose, the burden shifts to the government.**

17       Because Mr. Cortez-Mendoza has met his burden under *Arlington Heights*, the

18   burden shifts to the government to establish that "the same decision would have

19

---

[88] Ex. E (Testimony of Professor Gonzalez O'Brien) at 129–30.

resulted even had the impermissible purpose not been considered." 429 U.S. at 270 n.21.

The government has conceded the Undesirable Aliens Act was motivated by racial animus. The 1952 Congress did not address that history when it recodified the criminalization of reentry in § 1326, and its enactment of that statute was itself motivated by discriminatory intent. While Congress has since amended § 1326 to make it more punitive, it has never addressed the racism that motivated the original unlawful reentry statute or its recodification. As Judge Du found, "at no point has Congress confronted the racist, nativist roots of Section 1326." *Carrillo-Lopez* at *24. There is no evidence that the Congress acted with nondiscriminatory motivation— i.e., that "the same decision would have resulted even had the impermissible purpose not been considered"—when it first criminalized reentry in the Undesirable Aliens Act or when it re-codified that statute at § 1326.

## IV.   CONCLUSION

When Judge Du found § 1326 violates the Fifth Amendment's equal protection guarantee, she made the morally and legally correct decision. Congress was undoubtedly motivated by racial animus when it first criminalized reentry in 1929 as a compromise designed to keep "rat men" from poisoning the Anglo-American gene pool while still allowing American industry to exploit cheap Latinx labor. Twenty-three years later, Congress was again motivated by racial animus when it doubled down on this racist deal by making it easier for the government to lock up Latinxs while exempting employers from prosecution.

This racist law has been on the books for nearly a century, and it has done incalculable damage. It has stigmatized and degraded countless Latinxs and torn their families apart. It gave rise to the Trump Administration's "zero tolerance" policy of prosecuting "100 percent of illegal Southwest Border crossings"[89] (illustrating that the racial animus of the 1920s and 1950s remains with us, as it is visa overstays—not border crossings—that account for the vast majority of unlawful immigration to the

---

[89] Dept. of Justice, "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," May 7, 2018, available at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-discussing-immigration-enforcement-actions. This same "zero tolerance" policy was behind the intentional and unconscionable separation of thousands of Latinx children from their families. *See, e.g., Ms. L. v. U.S. Immigration and Customs Enforcement*, 302 F.Supp.3d 1149 (S.D. Cal. 2018).

United States[90]) and Operation Streamline's en masse hearings with dozens of brown-skinned men shackled and crammed into federal courtrooms to be jointly arraigned, pled, and sentenced—all in one hearing:[91]



This mockery of due process and our founding ideals has sparked a reckoning with the sordid history of our criminal immigration laws. In December 2019, Representative Chuy García of Illinois (who was born in Mexico, the son of a farm laborer who came to the U.S. under the "Bracero Program") introduced the New

---

[90] *See The Real Illegal Immigration Crisis Isn't on the Southern Border*, The Atlantic, Apr. 19, 2019 (noting that, for the past decade, "visa overstays in the United States have outnumbered border crossings by a ratio of about 2 to 1").

[91] *See Assembly-Line Justice: A Review of Operation Streamline*, University of California, Berkeley Law School, The Chief Justice Earl Warren Institute on Race, Ethnicity & Diversity, Jan. 2010 ("The sheer number of defendants requires nearly all judges to combine the initial appearance, arraignment, plea, and sentencing into one en masse hearing. Many Operation Streamline defendants complete the entire criminal proceeding—meeting with counsel, making an initial appearance, pleading guilty, and being sentenced after waiving a presentence report—in a single day. Criminal Justice Act (CJA) Panel attorneys serve as counsel for the majority of defendants and are appointed to represent up to 80 clients in one hearing, which can foreclose individualized representation.").

1    Way Forward Act, which would repeal § 1326. In his introductory remarks on the

2    House floor, Representative García recognized that "[a]t this moment in history, we

3    are called to uphold our values of compassion, common humanity, and racial justice."

4    He argued that "[o]ur communities deserve dignity, restoration and repair, not

5    further criminalization." And he urged support for his bill to "correct[] racial and

6    anti-immigrant injustices embedded in our immigration laws, many of which have

7    enabled the Trump Administration's inhumane assault on non-citizens in the United

8    States and at our southern border."[92]

9        Representative García's eloquent appeal recognizes that § 1326 was motivated

10   by anti-Latinx racism and continues to visit injustice on Latinxs in our community.

11   The Constitution entrusts the judiciary with the responsibility of scrutinizing

12   legislation motivated by racial animus to ensure that such injustices are thwarted.

13       Mr. Cortez-Medoza respectfully asks that the Court find that § 1326 violates

14   the Fifth Amendment's equal protection guarantee and dismiss the indictment against

15   him.

16   ///

17   ///

18   ///

19

---

[92] *Congressional Record*, Dec. 10, 2019, at E1571–72, available at
https://www.congress.gov/116/crec/2019/12/10/CREC-2019-12-10-pt1-PgE1571-4.pdf.

Dated: February 28, 2022

Federal Defenders of Eastern Washington & Idaho
Attorneys for Obet Cortez-Mendoza

s/Molly M. Winston
Molly M. Winston, WSBA #50416
10 North Post Street, Suite 700
Spokane, Washington 99201
(509) 624-7606
molly_winston@fd.org

## Service Certificate

I certify that on February 28, 2022, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF System, which will notify Assistant

United States Attorney Michael Ellis.

s/Molly M. Winston
Molly M. Winston, WSBA #50416
10 North Post Street, Suite 700
Spokane, Washington 99201
(509) 624-7606
molly_winston@fd.org