Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Michael J. Ellis
Assistant United States Attorney
Post Office Box 1494
Spokane, Washington 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-CR-00131-RMP |
| Plaintiff, | GOVERNMENT'S RESPONSE TO MOTION TO DISMISS |
| vs. | |
| OBET CORTEZ-MENDOZA, | Date: March 8, 2022, at 10:30 a.m. Without Oral Argument[1] |
| Defendant. | |

The Defendant asks this Court to join an aberration – *United States v. Carrillo-Lopez*, __F. Supp. 3d__, 2021 WL 3667330 (D. Nev. Aug 18, 2021) – which, as the Court is aware, has been rejected by both this Court and every other district court to consider whether 8 U.S.C. § 1326 was enacted in violation of the Fifth Amendment's guarantee of equal protection. *See United States v. Munoz-De La O*, No. 2:20-CR-00134-RMP, 2022 WL 508892, at *8 (E.D. Wash. Feb. 18, 2022). As in *Munoz-De La*

---

[1] The Government agrees that oral argument and an evidentiary hearing are unnecessary in this matter and would instead ask the Court to incorporate by reference the testimony of Professor Deborah Kang and counsels' arguments from the January 28, 2022, motion hearing in *United States v. Munoz-De La O*, Case No. 2:20-CR-00134-RMP. *See* ECF No. 50-25.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 1

*O*, the Court should decline the Defendant's invitation.[2] *Carrillo-Lopez* rests upon the wrong legal standard, improperly creates a doctrine of legislative "original sin" by which subsequent iterations of Congress – separated by as much as seven decades – are forever tarred by the actions, words, and motivations of their most reprehensible predecessors, and ignores the legitimate governmental interests achieved through the criminalization of repeated unlawful reentries into the United States.

The Defendant dedicates much of his briefing to the historical background and congressional utterances involved in the passage of the Undesirable Aliens Act of 1929. The 1920's does little, however, to educate the Court on the motivations of the various Congresses that enacted the challenged criminal statute – § 1326 – which was not made part of the United States Code until 1952. The Defendant's focus on 1929 is telling – the evidence presented of racial animus is far weaker, speculative, and peripheral concerning the 82nd Congress in 1952. Even considering the affidavit and testimony of Professor Deborah Kang, evidence of racial animus remains nonexistent for the 100th, 101st, 103rd, and 104th Congresses, each of which reenacted § 1326. *See* ECF Nos. 50-19, 50-25. The Defendant's position also forces the Court to ignore

---

[2] As the Court is aware, the Court, while denying Mr. Munoz-De La O's motion to dismiss, rejected a number of the Government's arguments. *See Munoz-De La O*, 2022 WL 508892, at *9 (rejecting Government's argument that rational basis review applied), *10 (rejecting Government's argument that Mr. Munoz-De La O failed to demonstrate a disparate impact). The Government reproduces those arguments below to ensure that the issues are preserved for a likely appeal.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 2

Congress's express attempts to cleanse immigration law of past racial discrimination, such as the 89th Congress's passage of the Immigration and Nationality Act in 1965.

As noted, the Defendant's argument requires the Court to assign racist motivations to not one, not two, but *six* separate Congresses. Many of these congressional reenactments of § 1326 raised the penalties for unlawfully reentering the United States, incrementally increasing the statutory maximum sentence for aliens who victimize the community by committing felonies and aggravated felonies to include murder, sexual assault, and drug trafficking. While accurate that Congress has repeatedly created enhanced penalties for reentering aliens correlated to the seriousness of the alien's prior criminal transgressions, Congress also enacted § 1326(d) in 1996 to grant aliens an opportunity to challenge their prior removals – a benefit that, as the Court is well aware through its own familiarity with § 1326 prosecutions, accrues solely to the charged alien.

The Defendant, unable to find firm evidence in the congressional record to ascribe a racist intent to these numerous later Congresses, instead asks the Court to ignore this void and embrace the theory that any racism of the 1920's poisons United States immigration law no matter the motives of a given Congress. This "forever tainted" theory not only contravenes Supreme Court precedent but also has far-reaching consequences – taken to the logical extreme, the Defendant's argument would invalidate essentially every immigration-related statute. Attributing, without contemporaneous evidence, the motives of the past to those acting in the present both

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 3

defies common sense and requires the Court to declare as "racist" members of Congress for whom no such evidence exists. As the Supreme Court has repeatedly ruled that such misattribution is improper, the Defendant's claim fails.

This Court should follow *Munoz-De La O*,[3] as well as every one of its sister courts, and reject both *Carrillo-Lopez* and the Defendant's attempt to subvert the Government's repeatedly affirmed authority over immigration matters. The Defendant's focus on the 1920's betrays the weakness inherent in the Defendant's Motion – failing to find evidence of racial animus concerning § 1326, the Defendant is forced to delve deep into the past and try to impute those motives onto every subsequent Congress to enact, or reenact, the challenged statute. As this approach is legally improper, the Defendant's Motion should be denied.

## INTRODUCTION

The Defendant contends that 8 U.S.C. § 1326 violates the guarantee of equal protection inherent in the Fifth Amendment because a different statute enacted twenty years earlier was allegedly passed with racial motivations. The Defendant's argument fails for several reasons.

First, § 1326, originally passed as part of the comprehensive Immigration and Nationality Act of 1952, is well within Congress's exclusive authority to enact laws controlling, restricting, and managing immigration into the United States. Section

---

[3] As noted above, although the Government asks the Court to follow *Munoz-De La O* in denying the Defendant's Motion, the Government seeks to preserve the arguments rejected by the Court for a likely appeal.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 4

1326 is a natural inclusion in that body of laws, connected to a legitimate governmental interest – deterrence of repeat violators and, when factoring in the enhanced penalties from later reenactments, protection of the public from unlawful aliens who commit felonies, and aggravated felonies, while within the United States. Such laws are subject to deferential rational basis review, not the strict scrutiny as urged by the Defendant. As the Ninth Circuit has explicitly found that § 1326 is "well within the ambit of Congress's sweeping power over immigration matters," *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998), the Court's analysis should end without encroaching upon ground properly left to Congress.

Second, the Defendant's argument relies on the imputation of Congress's alleged motivations in 1929 to the 82nd Congress in 1952 that originally passed the statute under which the Defendant is being prosecuted. Thus, the Defendant asks this Court to do exactly what the Supreme Court has instructed courts not to do – impute the motivations of one legislature onto all the rest, despite weak, if any, evidence of shared racial animus. The Defendant then demands that this Court take the further, radical step of ascribing the racist motivations imputed onto the 82nd Congress to *four* further Congresses – despite providing absolutely no evidence of discriminatory intent.[4]

---

[4] While Professor Kang, testifying in *Munoz-De La O*, opined that each reenactment of § 1326 in the 1980's and 1990's was tainted by racism, Professor Kang was repeatedly unable to point to any source within the legislative history where such congressional motives were evidenced concerning § 1326. In fact, as acknowledged

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 5

**BURDEN**

The Defendant has the "heavy burden of proving that racism motivated Congress to enact § 1326 specifically." *United States v. Machic-Xiap*, __F. Supp. 3d__, 2021 WL 3362738, at \*2 (D. Or. Aug. 3, 2021); *see also Abbott v. Perez*, __U.S.__, 138 S. Ct. 2305, 2324 (2018) (burden of proof lies with the challenger claiming a law was enacted with discriminatory intent). The Defendant must carry his burden by a preponderance of the evidence. *Hunter v. Underwood*, 471 U.S. 222, 225 (1985).

**ARGUMENT**

I.    Statutory background concerning immigration and unlawful reentry into the United States

Migration to the United States was unrestricted until 1875, when Congress restricted the immigration of criminals and prostitutes. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588 n.15 (1952). Several other statutes followed, *see Mandel*, 408 U.S. at 761, and in 1917, Congress passed the first legislation requiring deportation of certain aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. The next year, Congress attached criminal penalties to the violation of certain immigration laws. Under the Passport

---

by Professor Kang, the reenactments of § 1326 generated little to no debate or discussion. *See* ECF No. 50-25.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 6

Act of 1918, Congress gave the President authority to restrict the entry of non-citizens into the country during wartime and attached criminal penalties to violations. Act of May 22, 1918, Pub. L. No. 65-154, ch. 81, 40 Stat. 559. Relying on this authority, the President required noncitizens to present a passport to obtain entry into the United States. *See Flora v. Rustad*, 8 F.2d 335, 336 (8th Cir. 1925) (documenting the President's use of the powers granted to him by the Passport Act of 1918).

But the 1917 Immigration Act had no generally applicable criminal penalty, other than repeated deportation, and thus lacked any effective deterrent mechanism. Accordingly, in 1929, the 70th Congress made unlawful entry a misdemeanor offense and illegal reentry a felony.[5] *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2. *see also United States v. Corrales-Vazquez*, 931 F.3d 944, 947 (9th Cir. 2019) ("In 1929, Congress decided that aliens who 'enter the United States surreptitiously' should be subject to not only deportation but also criminal penalties, and revised the prohibitions in the 1917 statute[.]") (internal citation omitted).

Over two decades later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to

---

[5] Criminalizing the reentry of certain classes of deported noncitizens had been done previously: under a 1910 law, it was illegal to reenter the United States after having been deported for prostitution. Act of March 26, 1910, ch. 128, § 3, 36 Stat. 264, 264–65 (codified at 8 U.S.C. § 138 (1926)). Violations were punishable by up to two years imprisonment. *Id.* A law passed in 1918 made it illegal to reenter the United States after having been deported for being an anarchist. Act of October 16, 1918, Pub. L. No. 61-107, ch. 186, § 3, 40 Stat. 1012–13 (codified at 8 U.S.C. § 137(h) (1926)). Violations were punishable by up to five years in prison. *Id.*

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 7

immigration, naturalization, and nationality" of the United States. *See* Pub. L. No.

82-414, 66 Stat. 163 (introduction); *see also E. Bay Sanctuary Covenant v. Trump*,

932 F.3d 742, 756 (9th Cir. 2018) ("In 1952, Congress replaced this disparate

statutory scheme with the [INA], which remains the governing statutory

framework."). Through the INA, "Congress substantially revised the immigration

laws[.]" *City & Cty. of San Francisco v. United States Citizenship & Immigration

Servs.*, 944 F.3d 773, 795 (9th Cir. 2019). In this renewed and comprehensive

legislation, Congress passed another statute criminalizing unlawful reentry after

deportation. The new statute provided as follows:

> Any alien who (1) has been arrested and deported or excluded and
> deported, and thereafter (2) enters, attempts to enter, or is at any time found
> in, the United States, unless (A) prior to his reembarkation at a place
> outside the United States or his application for admission from foreign
> contiguous territory, the Attorney General has expressly consented to such
> alien's reapplying for admission; or (B) with respect to an alien previously
> excluded and deported, unless such alien shall establish that he was not
> required to obtain such advance consent under this or any prior Act, shall
> be guilty of a felony[.]

Pub. L. No. 82-414, § 276, 66 Stat. 229.

And thus the 82nd, not the 70th, Congress enacted § 1326. Congress has since

reenacted § 1326 multiple times. In almost every instance, the statute was revised to

increase its deterrent value, typically for unlawfully reentering aliens who had

committed serious offenses while within the United States. In the Anti-Drug Abuse

Act of 1988, the 100th Congress added subsection (b) to § 1326, creating enhanced

penalties for aliens with prior felony convictions. *See* Pub. L. No. 100–690, § 7345,

102 Stat. 4181; *see also United States v. Maul-Valverde*, 10 F.3d 544, 545 (8th Cir. 1993) ("Congress enacted 8 U.S.C. § 1326(b) in 1988 to substantially increase the criminal penalty if an illegally reentering alien was previously deported following a felony conviction."). Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101–649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, § 441(a), 110 Stat. 1214, 1279 (enacting 8 U.S.C. § 1326(d) in light of *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987)); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104–208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excludedand deported," and inserting "denied admission, excluded, deported, or removed").

Congress's continual strengthening of § 1326's deterrent value "suggests a crystallizing vision on Congress's part of the need for stern punishment in this milieu." *United States v. Dwinells*, 508 F.3d 63, 69 (1st Cir. 2007); *see also United States v. Shill*, 740 F.3d 1347, 1352 n.5 (9th Cir. 2014) ("The development of [18 U.S.C. ]§ 2422(b) reflects congressional intent to impose increasingly harsh penalties on those who entice, or attempt to entice, minors to engage in unlawful sexual activity."). Or, straightforwardly, Congress's repeated reenactment of § 1326 demonstrates Congress's will that unlawful reentry into the United States remain a serious offense.

II.   The Defendant has not established an Equal Protection Clause violation as (1) immigration matters are subject to highly deferential rational basis review and, alternatively, (2) the Defendant's attempt to stretch *Arlington Heights* is unsuccessful given the lack of evidence of racist intent on the part of the 82nd Congress, let alone the numerous subsequent Congresses to reenact § 1326

The Defendant asks this Court to ignore the Supreme Court's repeated deference to Congress concerning immigration matters, even when confronted with a challenge under the Equal Protection Clause. *See Fiallo v. Bell*, 430 U.S. 787 (1977). This is legally incorrect and improperly invades terrain left to the political branches. Further, the Defendant, by focusing on the Undesirable Aliens Act of 1929, betrays the critical weakness undermining his Motion – the failure to present any evidence that the 82nd Congress, or the four subsequent Congresses to reenact § 1326, were motivated by racial animus. The Defendant's Motion therefore fails and must be denied.

A.   As Congress's immigration laws are subject to deferential rational basis review, § 1326 passes muster as the criminal provision is related to legitimate governmental interests

For more than a century, "it has been universally acknowledged that Congress possesses authority over immigration policy as 'an incident of sovereignty.'" *Hernandez-Guerrero*, 147 F.3d at 1076 (internal citation omitted). Congress's inherent immigration power has been varying described for its breadth – "plenary" according to the Supreme Court; "sweeping" to the Ninth Circuit. *See id*. (citing *Mandel*, 408 U.S. at 765; *Catholic Social Servs. v. Reno*, 134 F.3d 921, 927 (9th Cir. 1998)).

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 10

Whatever the label, Congress's expansive authority over immigration affairs is "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, and subject only to "narrow judicial review," *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976); *see also Mathews v. Diaz*, 426 U.S. 67, 82 (1976) (describing the "narrow standard of [judicial] review of decisions made by the Congress or the President in the area of immigration and naturalization); *Fiallo*, 430 U.S. at 792 ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation."). This deferential standard of review applies equally to constitutional questions. *Trump v. Hawaii*, __U.S.__, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review" applies in the context of Establishment Clause challenge to executive order concerning immigration).

This "deferential standard of review" is limited to considering whether the challenged law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769. In *Mandel*, professors who wished to hear a Belgian journalist, barred from entering the United States, challenged the Attorney General's exercise of discretion under the First Amendment. *See id*. at 756–60. Although the Supreme Court acknowledged that the challengers' First Amendment constitutional rights were implicated, the Court nonetheless limited its review to whether a "facially legitimate and bona fide" reason was present. *See id*. at 764–65, 769. Given the authority of the political branches over immigration matters, the Court held that "when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will

neither look behind the exercise of that discretion, nor test it by balancing its justification" against others' asserted constitutional interests. *See id*. at 770. *Mandel*, and the inherent deference regarding immigration matters, continues to apply. *See Kerry v. Din*, 576 U.S. 86, 105 (2015) ("*Mandel* instructs us not to 'look behind' the Government's exclusion of" the alien); *see also Sesay v. United States*, 984 F.3d 312, 315–16 (4th Cir. 2021) (same); *Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir. 2017) (*Din* "left things as *Mandel* had left them," and "*Mandel* tells us not to go behind a facially legitimate and bona fide explanation").

 *Mandel*'s deferential test applies equally to both congressional decision making and challenges under the Equal Protection Clause. In *Fiallo*, the Supreme Court considered a law giving immigration preferences to mothers of illegitimate children. *Fiallo*, 430 U.S. at 789. In reviewing an Equal Protection Clause challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *See id*. at 795. The Court clarified that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision." *See id*. at 799; *see also Hawaii*, 138 S. Ct. at 2419 (citing *Fiallo*'s principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

 In the Ninth Circuit, *Mandel* and *Fiallo*'s "facially legitimate and bona fide" test is "equivalent to the rational basis test typically applied in equal protection

cases." *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995); *see also Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard and uphold them if they are 'rationally related to a legitimate government purpose.'") (internal citation omitted). As repeatedly noted by the Court, different rules apply to immigration matters. *See Fiallo*, 430 U.S. at 792 ("[I]n the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'") (internal citation omitted).

Despite being a criminal law, § 1326 is at its heart an immigration provision, and therefore subject to deferential review. Indeed, the Ninth Circuit has explicitly found that § 1326 – a criminal law – is "well within the ambit of Congress's sweeping power over immigration matters," and has endorsed the statute as serving a critical governmental function: "In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined – all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078.

Multiple other district courts have found that heightened scrutiny under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), does not apply to the Defendant's challenge. *See United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801, at *5 (D. Ariz. May 25, 2021) (finding *Arlington Heights* inapplicable and that a rational basis supported

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 13

§ 1326 – *i.e.* that "Congress sought in the § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders"); *United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL 3570229, at *4 (D. N.M. Aug. 12, 2021) (noting that "Defendant's analysis of § 1326 under the *Arlington Heights* standard is incorrect, because as an immigration law, it is subject to rational basis review"); *see also United States v. Orozco-Orozco*, No. 21-CR-02349-TWR, 2021 U.S. Dist. LEXIS 178951, at *1 n.1 (S.D. Cal. Sept. 20, 2021) (finding that rational basis review applies based on *Hernandez-Mancilla*).

*Carrillo-Lopez* disregards the above by focusing on two Ninth Circuit cases addressing Equal Protection claims concerning Presidential and federal agency executive action. *See Carrillo-Lopez*, 2021 WL 3667330, at *2 (citing *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 518–20 (9th Cir. 2018), and *Ramos v. Wolf*, 975 F.3d 872, 896–99 (9th Cir. 2020)). However, neither *Carrillo-Lopez*, nor *Regents*, nor *Ramos* address the deference due to Congress when enacting immigration laws. *See Fiallo*, 430 U.S. at 795; *Hernandez-Mancilla*, 633 F.3d at 1185. As the Defendant challenges a congressional statute, it is the deference due to Congress, not the President, that is the relevant inquiry. As *Carrillo-Lopez* failed to afford Congress the appropriate deference, the Defendant's reliance upon the decision is misplaced.

The Ninth Circuit has already determined that § 1326, with the statute's clear focus on deterring aliens from unlawfully reentering the United States, satisfies

rational basis review. *See Hernandez-Guerrero*, 147 F.3d at 1078. The Defendant's

challenge therefore fails.

> B. *Arlington Heights* is not applicable and the Defendant's reliance upon the decision is misplaced

The Defendant relies exclusively on an inapplicable decision – *Arlington Heights*. The expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." *Arlington Heights*, 429 U.S. at 267–68. This does not comport with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.

The Supreme Court identified the inherent problem with the congressional motive-probing urged by the Defendant in *United States v. O'Brien*, 391 U.S. 367, 384 (1968):

> It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 15

*Id.* at 384. Indeed, the Supreme Court cautioned of "the hazards of declaring a law unconstitutional because of the motivations of its sponsors [as] it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971).

> 1. The 1929 Congress's comments and motives are minimally relevant to the inquiry before the Court as the 70th Congress was not discussing § 1326 at all, and certainly not the version of § 1326 – enacted some seventy years later – that the Defendant is charged with violating

The Defendant devotes numerous pages recounting the history of the Undesirable Aliens Act and surrounding events in the 1920's. *See* ECF No. 50 at 8–16. However, as the Defendant is not charged with violating the Undesirable Aliens Act, or its predecessor version of criminal reentry, the discussion had little relevance to the Defendant's Motion targeting a different statute enacted more than twenty years later.[6]

"The ultimate question" under *Arlington Heights* is "whether a discriminatory intent has been proved in [the] given case" – that is, for the particular challenged enactment. *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980). "More distant instances

---

[6] Critically, as the criminal provision in the 1929 Act did not include the "found in" clause that creates venue for the Indictment in the Eastern District of Washington, the Defendant, not alleged to have reentered the United States over the Canadian border between the Cascade Mountains and North Idaho, would not be prosecutable in the Eastern District of Washington under the 1929 Act. Only § 1326, as enacted in 1952, provides the legal basis for the Indictment.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 16

of official discrimination in other cases are of limited help in resolving that question." *See id.* Here, the primary discriminatory intent cited by the Defendant is neither recent – preceding § 1326 by over two decades – nor proven in the "given case," – *i.e.* the 1952 statute or any of its subsequent versions. While "legislative or administrative history may be highly relevant," the Court has specified that this is so only "where there are *contemporary* statements by members of the decision making body[.]" *Arlington Heights*, 429 U.S. at 268 (emphasis added); *see also id.* at 267 (focusing the Court's "historical background" analysis on the "specific sequence of events leading up to the challenged decision").

The Supreme Court's most recent application of *Arlington Heights* undermines the Defendant's expansive position. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, __U.S.__, 140 S. Ct. 1891, 1916 (2020) ("[T]hese statements – remote in time and made in unrelated contexts – do not qualify as 'contemporary statements' probative of the decision at issue.") (quoting *Arlington Heights*, 429 U.S. at 268). In *Regents*, the proffered alleged discriminatory statements were made by President Trump – and therefore within a year or so of DACA's recission in 2017. *See id.* If statements made within a year of the challenged action are too "remote in time" to be deemed relevant, the Defendant's attempt to broaden the inquiry to statements made some twenty years earlier necessarily fails. Accordingly, whatever was said about or motivated the Undesirable Aliens Act in 1929 cannot be read to inform later debate concerning § 1326, an entirely separate statute enacted over

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 17

twenty years later.

  2.  The Defendant's evidence for racial animus on the part of the 1952 Congress does not rise to the level of demonstrating discriminatory intent on the part of the 82nd Congress

Perhaps recognizing that transposing the motivations of one legislature to another legislature over twenty years later is tenuous, the Defendant makes a strained argument that racial animus motivated the 1952 Congress as well. First, the Defendant cites President Truman's veto statement that the INA "perpetuate[d]" "racial or national barriers to naturalization." But President Truman was voicing his concern about the INA's continued use of a quota system that disfavored immigrants from Asia and certain parts of Europe, not with the treatment of immigrants from Latin America. Harry Truman, *Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality* (June 25, 1952). And President Truman's statement had nothing to do with, nor mentioned, § 1326 – the sole provision of the 1952 INA relevant to the Defendant's Motion. *See id*.; *see also Machic-Xiap*, 2021 WL 3362738, at *13 ("President Truman's statements, thus, do not prove that racial animus motivated Congress to enact § 1326."). In any event, courts should not give great weight to opponents of legislation. *See N. L. R. B. v. Fruit & Vegetable Packers & Warehousemen, Loc. 760*, 377 U.S. 58, 66 (1964) ("[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach.").

The Defendant also points to the comments of then-Deputy Attorney General Peyton Ford using the term "wetback." But Peyton Ford was not a member of Congress and, as such, did not vote for or against the 1952 INA. His comments therefore cannot be indicative of the motivations of Congress. *See Machic-Xiap*, 2021 WL 3362738, at *13 ("Because Ford was not a member of Congress, however, his use of the epithet is limited evidence of Congress's purpose in enacting § 1326.").

Further, the Defendant refers to the 82nd Congress's passage of Senate Bill 1851. However, as with the Defendant's other proffered evidence that racial animus spurred the passage of § 1326, Senate Bill 1851 had nothing to do with unlawful reentry.

Finally, the Defendant points to the similarity of the illegal reentry laws passed in 1929 and 1952 as evidence that the 82nd Congress apparently acquiesced to the racial animus of the 70th Congress. But, unlike the complicated zoning scheme at issue in *Arlington Heights*, criminalizing illegal reentry is rather simple; one of the least complex laws in the United States Code. How could the laws not be similar?[7]

   3.  The "forever tainted" argument put forth by the Defendant finds no support in Supreme Court precedent

The Defendant cannot escape the reality that the "governing statutory

---

[7] As acknowledged by Professor Kang, the 1929 Act and § 1326 contain a number of critical differences including the insertion of the "found in" clause, the removal of a "lawfulness" requirement, and the elimination of a number of precursor statutes criminalizing re-entry into the United States after removal. *See* ECF No. 50-25 at 94–96.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 19

framework" of United States' immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163; *E. Bay Sanctuary Covenant*, 932 F.3d at 756. Or, that the 89th Congress redefined immigration law through an expressly anti-discriminatory lens in passing the Immigration and Nationality Act of 1965. See Pub. L. No. 89-236, 79 Stat. 911 (October 3, 1965). Nor can he escape the fact that § 1326 has been updated or modified by four subsequent Congresses.

The Defendant waves away this lengthy congressional record, claiming "[r]ecodification does not automatically reset legislative intent." ECF No. 50 at 17. Under the Defendant's view, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. This not only directly contravenes the Supreme Court's guidance but makes little intuitive sense. Whether intentional discrimination motivated the 1929 legislation is a question about the motives of the 70th Congress. The same is true for the 82nd, 100th, 101st, 103rd, and 104th Congresses when those bodies considered § 1326 in 1952, 1988, 1990, 1994, 1996, and 1997. Legislative intent is not an artifact that carries over from one law to the next; it must be decided anew with each successive enactment. *See City of Mobile*, 446 U.S. at 74 (inquiring "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful").

Various post-*Arlington Heights* cases undermine the Defendant's argument as,

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 20

while historical background can serve as one source of evidence of intentional

discrimination, "unless historical evidence is reasonably contemporaneous with the

challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279,

298 n.20 (1987); *see also id*. ("Although the history of racial discrimination in this

country is undeniable, we cannot accept official actions taken long ago as evidence of

current intent."). The Supreme Court, when applying *Arlington Heights*, has viewed

variants of the "forever tainted" argument with appropriate skepticism. For example,

in *Pacific Gas & Electric Co. v. State Energy Resources Conservation &*

*Development Commission*, 461 U.S. 190 (1983), the Court held as follows:

> [P]etitioners note that Proposition 15, the initiative out of which § 25524.2
> arose, and companion provisions in California's so-called nuclear laws, are
> more clearly written with safety purposes in mind. It is suggested that
> § 25524.2 shares a common heritage with these laws and should be
> presumed to have been enacted for the same purposes. The short answer
> here is that these other state laws are not before the Court, and indeed,
> Proposition 15 was not passed; these provisions and their pedigree do not
> taint other parts of the Warren-Alquist Act.

*Id.* at 215–16.

Most recently, in *Abbott*, the Court explained that "the presumption of

legislative good faith [is] not changed by a finding of past discrimination." *Abbott*,

138 S. Ct. at 2324. In so holding, the Court reiterated that "past discrimination

cannot, in the manner of original sin, condemn governmental action that is not itself

unlawful." *See id*. (quoting *City of Mobile*, 446 U.S. at 74). Critically, the Court

clarified that "we have never suggested that past discrimination flips the evidentiary

burden on its head" – *i.e.* a challenger must independently prove discriminatory intent

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 21

by the legislature that enacted, or reenacted, the legislation. *See id.* at 2325. *Abbott* could not be any clearer – the more recent legislature "was not obligated to show that it had 'cured' the unlawful intent that" has been attributed to the prior legislature. *See id.* at 2313; *see also id.* at 2325 ("[The district court erroneously] imposed on the state the obligation of proving that the [later] Legislature had experienced a true 'change of heart.'").

Taken collectively, *McCleskey*, *City of Mobile*, *Pacific Gas*, and *Abbott* mandate the rejection of the Defendant's attempt to shoehorn legislative history from the 1920's into the present-day version of § 1326. Analyzing § 1326 through the lens of its possible predecessor statute makes little conceptual sense – the 1929 statute is simply "not before the Court[.]" *See Pacific Gas*, 461 U.S. at 215–16. As in *McCleskey*, the Defendant's evidence from the 1920's "has little probative value" for understanding Congress's motivation for enacting § 1326 in 1952, to say nothing of its intent in 1988, 1990, 1994, 1996, or 1997. *See McCleskey*, 481 U.S. at 298 n.20.[8]

//

//

---

[8] As the Court is aware, the Court, in *Munoz-De La O*, rejected the Defendant's proposed "forever tainted" argument as (1) the Court rejected "the notion that similarities between [the 1929 Act and § 1326], enacted two decades apart forever taints the later legislation, particularly where the members of Congress have completely changed in the ensuing years" and (2) the Supreme Court has held that "imputing discriminatory intent to a racially neutral law based on the existence of a prior discriminatory law does not mean that the ill motivations of prior laws are automatically imputed to a legislative recodification." *See Munoz-De La O*, 2022 WL 508892, at *15.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 22

4.  *Carrillo-Lopez*'s, and by extension the Defendant's, attempts to find support for the "forever tainted" argument are unavailing

The cases *Carrillo-Lopez* relies on for a "forever tainted" argument do not support it. Relying on concurring opinions in *Ramos v. Louisiana*, __U.S.__, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Department of Revenue*, __U.S.__, 140 S. Ct. 2246 (2020), *Carrillo-Lopez* concluded that Congress's failure to "grapple with the racist history of Section 1326 or remove its influence on the legislation" tainted the various reenactments by subsequent Congresses. *See Carrillo-Lopez*, 2021 WL 3667330, at *24. While correctly noting that the concurring opinions were "not binding precedent," *Carrillo-Lopez* nonetheless found the "reasoning . . . persuasive," *see id.*, and proceeded to ignore *McCleskey*, *City of Mobile*, *Pacific Gas*, and *Abbott* – all of which hold that a statute need not be cleansed of any prior discriminatory intent.

5.  Even assuming that the Court disagrees with the above and concludes that (1) Defendant's "forever tainted" position is legally tenable; (2) it is permissible for the Court to probe the motives of Congress; (3) *Arlington Heights* applies to probe the justifications of Congress's immigration legislation; and (4) the statements and motivations of persons in the 1929 Congress can be attributed to those in the 1952 Congress, the Defendant's claim still fails under *Regents*

The Defendant does not demonstrate a disparate impact.[9] The Defendant cites

---

[9] The Defendant claims that "[i]n prior equal protection challenges to § 1326, the government has not disputed the statute bears more heavily on Latinxs." *See* ECF No. 50 at 6. This is a mischaracterization. The Government in both *Machic-Xiap* and *Carrillo-Lopez* conceded, as does the Government here, that "most prosecutions for illegal reentry are against persons from Latin America." *See Machic-Xiap*, 2021 WL 3362738, at *10. However, in both cases the Government advanced the same

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 23

the higher percentage of illegal reentry prosecutions of Latinx defendants as proof of disparate impact and discrimination. It is not. Those numbers are a product of geography, not discrimination. Indeed, if it were enough to state an Equal Protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity – to include those from a country sharing 1,954 miles of border with the United States – virtually any immigration law could be challenged on that ground. *See Regents*, 140 S. Ct. at 1915–16 (finding that the disparate impact of DACA rescission on Latinos from Mexico - totaling 78% of DACA recipients - did not establish a plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds").

The statistics the Defendant cites for disparate impact are a feature of geography and geopolitics – Latin America's proximity to the United States and related socioeconomic and political conditions – not discrimination. This alone is sufficient to reject the Defendant's *Arlington Heights* analysis, given that the Defendant cannot show a true disparate impact caused by racial animus. *See Regents*,

---

argument as here – that this is a product of geography and geopolitics, not discrimination, and therefore does not result in a disparate impact under *Arlington Heights*. *See id.* at *11; *Carrillo-Lopez*, 2021 WL 3667330, at *6. The Government has therefore not conceded, as the Defendant suggests, disparate impact.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 24

140 S. Ct. at 1915–16.

The Defendant, again, selectively cites *Carrillo-Lopez* and *Machic-Xiap* as definitive support that "courts have found the statute disparately impacts Latinxs." *See* ECF No. 50 at 6. Contrary to the Defendant's position, other district courts have adopted the Government's common-sense position echoing the Supreme Court's analysis concerning DACA. *See Novondo-Ceballos*, 2021 WL 3570229, at *5 ("The Court agrees with the Government in that '[t]he proximity of a very large population of Hispanics to the Southern Border, as well as the political and financial realities unique to Central America, fully explain the disproportionate number of Hispanics charged with violating § 1326.'"); *Gutierrez-Barba*, 2021 WL 2138801, at *4 ("Indeed, numerous courts examining similar contentions have held that criminal immigration statutes do not disproportionately affect Mexican citizens because any disparate impact may be explained on grounds other than race, such as geographic proximity to the United States.").

*Carrillo-Lopez* attempts to distinguish *Regents* without success. The court noted that "[i]n *Regents*, the Court found that disparate impact *alone* had not been demonstrated." *Carrillo-Lopez*, 2021 WL 3667330, at *6 (emphasis in original). But *Regents* is unambiguous – when referencing the fact that "Latinos make up a large share of the unauthorized alien population," the Court expressly held that "[w]ere this fact sufficient to state a claim" of disparate impact, "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *See*

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 25

*Regents*, 140 S. Ct. at 1915–16. To avoid the Supreme Court's clear statement concerning disparate impact and immigration statutes, *Carrillo-Lopez* engages in highly questionable reasoning, essentially finding that *Regents*' holding that there was no disparate impact is irrelevant as the Supreme Court also found no discriminatory intent. *See Carrillo-Lopez*, 2021 WL 3667330, at *6. This is illogical – disparate impact either exists or it doesn't and is independent from whether there is also evidence of discriminatory intent.

*Carrillo-Lopez*'s second rationale – that "because Mexican citizens will likely make up more unlawful reentries because they are a higher percentage of the overall illegal alien population, they cannot raise equal protection challenges" – is simply inaccurate. *See id.* at *7. The fact that a lower standard of review – deferential rational basis – applies to the Defendant's Equal Protection challenge does not somehow remove the Defendant's ability to raise the issue.

Both conclusions betray *Carrillo-Lopez*'s core error in disregarding the highly deferential review granted to Congress concerning immigration matters. This Court should follow the Supreme Court's guidance and decline to adopt a position that renders "virtually any generally applicable immigration policy" subject to invalidation on "equal protection grounds." *See Regents*, 140 S. Ct. at 1916.

Further, the Defendant cannot substantiate the remaining *Arlington Heights* factors. The Defendant's experts, in another proceeding, "both testified that the legislative history of the [1952] INA was largely free of explicitly racist expressions."

*See Machic-Xiap*, 2021 WL 3362738, at *13. The Defendant has failed to reveal procedural or substantive irregularities underlying the 1952 INA. *See id.* at *14 (noting that "the INA followed a comprehensive review of the entire panoply of the nation's immigration laws" and that "Congress passed the INA after study by committee and significant debate"). Accordingly, the Defendant has not presented sufficient evidence to justify a finding that the 82nd Congress, let alone the 100th, 101st, 103rd, and 104th Congresses, was motivated by racial animus when enacting § 1326. *See id.* (finding that "because the Court finds that Mr. Machic-Xiap has not proven that racial animus was a motivating factor in the enactment of § 1326, the Court need not consider the import of later reenactments of § 1326").

      6.   Assuming the Court engages with *Arlington Heights*, the numerous subsequent reenactments of § 1326 – with no evidence of racial animus – provide incontrovertible evidence that Congress would have criminalized unlawful reentry regardless of any racially discriminatory motivation from the 1920's

Even if the Court were to conduct a motive-probing inquiry under *Arlington Heights* and conclude that a discriminatory purpose was a motivating factor behind the 1929 immigration law's enactment, and that the motive behind the 1929 enactment was relevant to the 82nd Congress's passage of § 1326 in 1952, the burden would then "shift[] to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228. Speculation is not required to determine that the law would have been enacted regardless of what was said in 1929 or 1952 – § 1326 has been repeatedly modified and amended, leading to

the straightforward inference that a Congress willing to raise the penalties for an unlawful reentry violation would have criminalized the act if § 1326 did not then exist.

The Defendant, while citing the correct standard, does not engage with it, instead attempting to mandate that the Government prove not only that the statute would have been enacted regardless but that Congress "addressed the racism that motivated the original reentry statute or its recodification." *See* ECF No. 50 at 33. As conceded in *Carrillo-Lopez*, this additional supposed requirement is only supported by concurring opinions and is therefore not binding on the Court. *See Carrillo-Lopez*, 2021 WL 3667330, at *24. Evidence that the statute was "cleansed" of any discriminatory past is not necessary under *Arlington Heights*. *See Abbott*, 138 S. Ct. at 2325 ("[The district court erroneously] imposed on the state the obligation of proving that the [later] Legislature had experienced a true 'change of heart.'").

Ultimately, even accepting the worst of the Defendant's statements concerning the 70th and 82nd Congresses, the Defendant cannot demonstrate that § 1326 violates the Fifth Amendment. Congress's repeated efforts—over the course of multiple decades—to strengthen the law against unlawful reentry underscores the implausibility of the Defendant's claim that Congress has been acting out of a discriminatory animus, rather than seeking to address the lasting, and difficult, problem of illegal immigration.

//

C. Professor Kang's affidavit and testimony, largely failing to uncover any insights into Congress's motivations when reenacting § 1326 during the 1980's and 1990's, fails to bolster the Defendant's claim that § 1326 was motivated by racial animus

The inquiry under *Arlington Heights* examines "whether invidious discriminatory purpose was a motivating factor" in the legislative or administrative action. *See Arlington Heights*, 429 U.S. at 266. Despite the focus on the *legislature's* intent when passing a given bill, Professor Kang instead highlights a small number of *legislators* per enactment of § 1326 – Senator McCarran,[10] Senator Chiles,[11] Senator Graham,[12] Representative McCollum,[13] Representative Foley,[14] Representative Solomon,[15] and Representative Smith.[16] As acknowledged by Professor Kang, these statutes were often enacted by wide margins – for example, 346-11 in the House of Representatives for the ADAA and 91-8 in the Senate for AEDPA. *See* ECF No. 50-19 at 50, 87. The various amendments to § 1326 appear to have been relatively uncontroversial. *See id.* at 86 (noting that "none objected to its proposal to add the new language to § 1326"), 92 (noting that while the IIRIRA "was repeatedly characterized as mean-spirited and racist," "the change to § 1326 stirred no debate in

---

[10] The Immigration and Naturalization Act of 1952.
[11] The Anti-Drug Abuse Act of 1988 (hereinafter the "ADAA").
[12] The Immigration Act of 1990.
[13] The Violent Crime Control and Law Enforcement Act of 1994 (hereinafter the "VCCLEA").
[14] The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter the "AEDPA").
[15] AEDPA.
[16] AEDPA and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (hereinafter the "IIRIRA").

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 29

Congress"); *see also United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) ("An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the Immigration and Nationality Act of June 27, 1952, but §§ 1325 and 1326 were not among the debated sections."). The views of one legislator – roughly the average presented by the Defendant per reenactment of § 1326 – cannot be ascribed to the entire legislature.

While dedicating many pages to general immigration issues throughout the twentieth century, Professor Kang offers specific insight into the motives of individual legislators justifying the criminalization of reentry only once: Senator Chiles' rationale supporting enhanced penalties for unlawful reentry as part of the ADAA. *See* ECF No. 50-19 at 44–46. As an individual congressman does not pass a law, Professor Kang is incorrect when claiming that "[i]t was in this xenophobic context that members of Florida's congressional delegation amended 8 U.S.C. § 1326 in 1988, 1990, 1994, and 1996." *See id.* at 34. The senators and representatives profiled by Professor Kang may have drafted and advocated for the various reenactments, but it took a majority of their fellow congressman – hundreds on each occasion – to ratify those measures into law. The absence of evidence concerning the motives of these hundreds of unnamed politicians substantially undercuts the Defendant's claim that each reenactment of § 1326 was motivated by racial bias – the Court cannot simply assume that the majority shared the claimed discriminatory motives of the few examined by Professor Kang.

Professor Kang notes the legislature's silence concerning reentry on multiple occasions. *See id.* at 21 ("In this context, Congress remained largely silent with respect to the recodification of the criminal entry and re-entry provisions of the immigration laws in the 1952 Act."), 51 (noting that "the legislative history of the 1990 amendment to 8 U.S.C. § 1326 is very thin"), 85 ("While a few congressmen raised objections to other provisions of HR 668, none challenged the additions to § 1326."). While the Defendant attempts to twist this silence into Congress's failure to fulfil its nonexistent duty to cleanse prior legislation of insidious origins, the Defendant cannot escape the reality that the presented evidence does not justify a finding that the legislators who enacted the various versions of § 1326 were motivated by racial bias when criminalizing unlawful reentry.

Professor Kang also repeatedly raise Congress's efforts to increase the penalty for unlawful reentry – without establishing a link between the amendments and racial animus and often providing a reasonable alternative justification for the change. *See id.* at 21 (noting that the 1952 Act made it easier to prosecute unlawful reentry where the defendant is "found in" the United States thus both alleviated proof concerns about determining a defendant's entry point into the United States and preserving government resources). Section 1326 – "a necessary piece of the immigration-regulation framework" – primarily serves the purpose of deterrence, a goal furthered through heightened penalties for more serious offenders. *See Hernandez-Guerrero*,

147 F.3d at 1078. The statute cannot simultaneously validly and invalidly deter continued violations of immigration law.

Overall, the Defendant and Professor Kang present little evidence regarding the reenactments of § 1326 in the 1980's and 1990's. Instead, both focus on other aspects of immigration law – such as asylum, refugee policy, admission quotas, and removal proceedings – and attempt to paint unlawful reentry with the same brush. Ultimately, however, the scant legislative history specifically concerning § 1326 fatally undermines the Defendant's claim. The Defendant, in order to succeed in his challenge to § 1326, must present evidence that § 1326, and not general immigration policy or other aspects of immigration law, was motivated by racial bias. The Defendant, having presented no evidence that the hundreds of unnamed senators and representatives who voted – over the course of fifty years – to criminalize unlawful reentry were motivated by racial bias when casted their votes, has simply failed to do so. One legislator's motive cannot be ascribed – without evidence – to the many others who voted the same way.

> D. *Carrillo-Lopez*'s, and by extension the Defendant's, attempts to justify its departure from every other decision to address the interplay between § 1326 and the Equal Protection Clause are unavailing

*Carrillo-Lopez* recognizes its own aberrant status – stating that "[a]s the Court understands the present status, no court that has addressed this issue has found that Section 1326 is unconstitutional under *Arlington Heights*." *See Carrillo-Lopez*, 2021 WL 3667330, at *18. The court's attempts to justify that departure are unavailing,

largely for the same reasons as discussed above.[17]

First, *Carrillo-Lopez* found that *United States v. Palacios-Arias*, No. 3:20-CR-62 (Oct. 13, 2020 E.D. Va.) (Exhibit A), addressed neither the perceived evidence of racial discrimination in 1952 nor the 1952 Congress's silence concerning the 1929 Congress. *See Carrillo-Lopez*, 2021 WL 3667330, at *19. *Palacios-Arias*, applying the exact standard the Government urges here, found that, as "courts typically apply rational basis review when considering the constitutionality of immigration laws," "§ 1326 satisfies rational basis review" as "[t]he government undoubtedly has a legitimate interest in deterring illegal reentry into the United States." *See* Exhibit A at 3–4. The court, while agreeing with the Government that *Arlington Heights* does not apply because "it is not the judicial role . . . to probe and text the justifications for" "congressional immigration policy," nevertheless found that the defendant's challenge would fail under *Arlington Heights*. *See id.* at 4.

Next, *Carrillo-Lopez* attempted to distinguish *United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D. V.I. June 16, 2021), on the basis that § 1326 "was neither specifically debated nor substantively changes" by the 82nd

---

[17] In addition to *Munoz-De La O*, numerous other district courts have rejected the Defendant's argument since *Carrillo-Lopez* was issued. *See United States v. Suquilanda*, No. 21 CR63 (VM), 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL 5166488, (N.D. Ohio Nov. 5, 2021); *United States v. Amador-Bonilla*, No. CR-21-187-C, 2021 WL 5349103 (W.D. Ok. Nov. 16, 2021); *United States v. Rivera-Sereno*, No. 2:21-cr-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021); *United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL 6125407 (D. Colo. Dec. 28, 2021); *United States v. Hernandez-Lopez*, __F. Supp. 3d __. 2022 WL 313774 (S.D. Tex. Feb. 2, 2022).

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 33

Congress. *See Carrillo-Lopez*, 2021 WL 3667330, at *19. However, *Wence* simply rejected the defendant's position (parroted by the Defendant) that "by failing to clearly repudiate the 1929 Act's racist origins, the subsequent reenactments of 8 U.S.C. § 1326 are necessarily tainted by the 1929 Act's discriminatory purpose." *See Wence*, 2021 WL 2463567, at *7. *Wence* highlights one of *Carrillo-Lopez*'s (and consequently the Defendant's) pitfalls – the "forever tainted" argument "improperly seeks to shift the burden to the Government and incorporates fallacious reasoning." *See id.* Finding that "the extensive deliberative process undertaken by Congress in 1952 and 1990, combined with the lack of legislative history directly addressing 8 U.S.C. § 1326, illuminates the absence of proof" of discriminatory intent hits the nail on the head – the Defendant's burden is to demonstrate racial animus by every Congress who enacted (or subsequently reenacted) § 1326, not to show the racial animus of a predecessor Congress and then attempt to paint every Congress since with the same brush. *See id.* at *9.

Finally, *Carrillo-Lopez* turned to *Machic-Xiap*, disagreeing (as with *Wence*) that legislation could be cleansed of prior racial animus without making "some substantive change." *See Carrillo-Lopez*, 2021 WL 3667330, at *20. *Machic-Xiap* adopted the Government's positions here – that the Truman veto override is of minimal value given the scant weight given to "statements of those who oppose the legislation" and that Deputy Attorney General Peyton Ford's statement is of little use in determining Congress's intent as he was not, in fact, a member of Congress. *See*

*Machic-Xiap*, 2021 WL 3362738, at *13. The court further added that the 1952 INA "followed a comprehensive review of the entire panoply of the nation's immigration laws," that "[t]he inclusion of a provision criminalizing illegal reentry was unsurprising," and that the defendant present no evidence that the 1952 Congress was directly influenced by racial animus in enacting § 1326. *See id.* at *14. *Machic-Xiap* further restated the Supreme Court's admonishment about "imputing the motivations of earlier legislatures to later ones" – that district courts should not do so. *See id.* This instruction applies equally to the 1952 and every subsequent Congress to consider § 1326 – unless the Defendant can demonstrate racial animus by each and every Congress, his argument fails.

*Carrillo-Lopez* is the definition of an outlier. The decision incorrectly (1) strips Congress of the deferential rational basis review to which immigration matters are entitled; (2) invents a doctrine by which statutes can be "forever tainted" by predecessor legislation; (3) ascribes the motives of a prior Congress to each and every subsequent Congress to address the same issue without directly addressing the prior animus; and, most importantly, (4) fails to account for the fact that multiple prior Congress's felt strongly enough about criminalizing unlawful reentry to raise the penalties – a fact that completely undermines the assertion that § 1326 would not exist if not for the racial animus present in 1929. *Carrillo-Lopez* is wrongly decided, and this Court should, as in *Munoz-De La O*, decline to perpetuate the error.

//

**CONCLUSION**

The Supreme Court has cautioned that courts "should be skeptical . . . of a claim that seeks to invalidate a statute based on a legislature's unlawful motive but does so without reference to the content of the legislation enacted." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006). This is, at its core, exactly the Defendant's approach.

The Defendant does not engage with the substance of § 1326 or its clear purpose. Rather, the Defendant's Motion is aimed at legislative history several times removed from the current version of the statute. "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *See Abbott*, 138 S. Ct. at 2324 (quoting *City of Mobile*, 446 U.S. at 74). Accordingly, the legislative history of an earlier Congress does not forever taint a law that has been repeatedly reenacted without any substantiated accusation of racial animus.

For the foregoing reasons, the Defendant's Motion to Dismiss should be denied.

Dated:   March 2, 2022.

Vanessa R. Waldref
United States Attorney

*s/Michael J. Ellis*
Michael J. Ellis
Assistant United States Attorney

1

## <u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on March 2, 2022, I electronically filed the foregoing with

3   the Clerk of the Court using the CM/ECF System which will send notification of such

4   filing to the following: Molly M. Winston

5

6

7                                        *s/ Michael J. Ellis*
                                         Michael J. Ellis
8                                        Assistant United States Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS - 37