

Molly M. Winston
Trial Attorney
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606

# United States District Court
## Eastern District of Washington
Honorable Rosanna M. Peterson

| | |
|---|---|
| United States, | No. 2:20-CR-000131-RMP |
| Plaintiff, | |
| v. | Reply to Government's Response to Motion to Dismiss |
| Obet Cortez-Mendoza , | |
| Defendant. | |

### TABLE OF CONTENTS

I. Introduction .................................................................................................... 1

II. Discussion ..................................................................................................... 2

    1. The government cannot protect racist criminal laws through application of an incorrect legal standard. ............................................................................ 2

        a. A race-based equal protection claim is properly accessed under *Arlington Heights*. .......................................................................................... 2

        b. *Arlington Heights* is a standard the government cannot meet, so they ask for a lower level of scrutiny. ............................................................. 4

        c. It cannot be that racist laws must stand so long as they touch on immigration. ................................................................................. 5

    2. The government concedes Congress acted with discriminatory intent when it criminalized reentry ....................................................................................... 7

        a. Recodification does not denounce or erase discriminatory intent ............... 8

        b. Dr. Kang's expert opinion confirms the 1952 Congress acted with a discriminatory purpose when it recodified the unlawful reentry statute ... 11

            i. The first factor (the law's historical background) shows a discriminatory purpose. .................................................................. 12

            ii. The second factor (events leading up to the law) shows a discriminatory purpose. .................................................................. 15

            iii. The third factor (legislative history) shows a discriminatory purpose. ........................................................................................ 16

            iv. The fourth factor (deviations from procedural norms) shows a discriminatory purpose. .................................................................. 18

    3. Subsequent amendments to § 1326 do not cleanse the law of racial animus. ........ 20

    4. Section 1326 disparately impacts Latinxs. ............................................... 24

III. Conclusion ................................................................................................ 27

REPLY

# I. Introduction

The government's arguments in its Response to Motion to Dismiss fail for three reasons:

1.  it applies the wrong legal standard;

2.  when applying the correct legal standard (*Arlington Heights*), it applies it incorrectly; and

3.  the disparate impact of § 1326 on Latinxs is undisputed.

The government attempts to divert the Court's attention from the totality of statute's blatant and pervasive racist history through assertion of two central arguments: 1) recodification cleanses the statute of is racist upbringing; and 2) disparate impact to the Latinx population can be fully explained away by geography. This stance is a complete distortion of reality and obscures the truth.

Congress acted with racial animus when it criminalized reentry after deportation. Nearly all prosecutions under § 1326 are against Latinxs. The Government fails to challenge Dr. Kang's expert opinion or make a showing that Congress would have enacted the unlawful reentry statute but for its discriminatory purpose. Mr. Cortez-Mendoza asks this Court to join the Honorable Miranda M. Du in finding that § 1326 violates the Fifth Amendment's equal protection guarantee. *See U.S. v. Carrillo-Lopez*, ___F.Supp.3d___, 2021 WL 3667330 (D. Nev. Aug. 8, 2021).

## II.    Discussion

### 1.  The government cannot protect racist criminal laws through application of an incorrect legal standard.

The government asks the Court to abandon the traditional equal-protection analysis and instead apply "deferential rational basis review."[1] Why? Because under the government's logic, § 1326—a criminal statute authorizing up to 20 years of incarceration—"is at its heart an immigration provision" (as opposed to a criminal provision), so "different rules apply."[2] Those different rules apply because immigration is "terrain left to the political branches," leaving § 1326 "largely immune from judicial control."[3] In effect, the government tries to change the rules because it cannot defend § 1326 under the appropriate *Arlington Heights* framework.

### a.  A race-based equal protection claim is properly accessed under *Arlington Heights*.

Trial courts routinely apply *Arlington Heights* to race- and ethnicity-based equal protection claims. [4] Just last year, a district court noted that, even in the civil immigration context, "[s]everal recent district court opinions have also applied the *Arlington Heights* framework to evaluate whether the federal government acted with

---

[1] ECF No. 52 at 11.

[2] ECF No. 52 at 13.

[3] ECF No. 52 at 10–11 (citations and quotations omitted).

[4] *See, e.g., California v. U.S. Dep't of Homeland Sec.*, 476 F.Supp.3d 994, 1018–23 (N.D. Cal. 2020); *Cook Cty., Illinois v. Wolf*, 461 F.Supp.3d 779, 789 (N.D. Ill. 2020); *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307, 325 (D. Md. 2018); *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F.Supp.3d 393,412 (D. Mass. 2018).

1    discriminatory purpose despite a facially neutral action." *California v. U.S. Dep't of*

2    *Homeland Sec.*, 476 F.Supp.3d 994, 1023 (N.D. Cal. 2020).

3          These district courts are correctly following the lead of the Ninth Circuit and

4    the Supreme Court. Twice in the past three years, the Ninth Circuit has applied

5    *Arlington Heights* in high-profile civil immigration cases. In *Ramos v. Wolf*, the Ninth

6    Circuit applied *Arlington Heights* in an equal-protection challenge to the government's

7    termination of the Temporary Protected Status program. 975 F.3d 872, 896 (9th Cir.

8    2020). And in *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, the Ninth

9    Circuit applied *Arlington Heights* in an equal-protection challenge to the government's

10   rescission of the Deferred Action for Childhood Arrivals (DACA) program. 908 F.3d

11   476, 518–20 (9th Cir. 2018). The Supreme Court then heard the DACA case, and at

12   least five Justices agreed *Arlington Heights* applied, although they rejected the

13   plaintiffs' claim on the facts. *See Dep't of Homeland Sec. v. Regents of the Univ. of*

14   *California*, 140 S.Ct. 1891, 1915–16 (2020); *id.* at 1917–18 (Sotomayor, J.).

15         If *Arlington Heights* applies to civil claims of race- and ethnicity-based

16   discrimination, it applies in the criminal context. This is consistent with basic

17   separation of powers principles: Congress makes the laws and courts determine

18   whether those laws pass constitutional muster. There is no reason the rules should be

19   any different just because a criminal law touches on immigration. As the Ninth Circuit

put it: "A challenged law does not receive minimal scrutiny merely because it is related to immigration." *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018).

>    **b.** ***Arlington Heights*** **is a standard the government cannot meet, so they ask for a lower level of scrutiny.**

In arguing for "deferential rational basis review," the government cites to a number of civil cases that are easily distinguishable. For example, the government cites to *Trump v. Hawaii*, 138 S.Ct. 2392 (2018), for the proposition that rational basis review "applies equally to constitutional questions."[5] The government fails to appreciate that President Trump's "Muslim ban" (at issue in that case) was a civil matter addressing the entry of individuals from outside the country.

That is not this case. Mr. Cortez-Mendoza's challenge is to a criminal statute employed to incarcerate members of our community for up to two decades. When one's liberty is on the line, the full panoply of constitutional protections applies. As the Supreme Court has held, constitutional protections are afforded to noncitizens even under civil immigration laws where the government seeks to "punish[] by deprivation of liberty and property." *Wong Wing v. U.S.*, 163 U.S. 228, 237 (1896).[6] When

---

[5] ECF No. 52 at 11.

[6] *See also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent") (citations omitted).

Congress imposes criminal sanctions, we have departed the "terrain left to political branches" and any hands-off review of legislation necessarily ends.

The government correctly notes that some district courts have bought its argument for rational-basis review,[7] but courts that have engaged with the issue have rightly been unpersuaded. *See, e.g., U.S. v. Carrillo-Lopez*, 2021 WL 3667330 at *1–3 (applying *Arlington Heights* after being "unpersuaded that a criminal law enacted by Congress is free from constitutional equal protection constraints, even if the offense relates to immigration"); *U.S. v. Machic-Xiap*, ___F.Supp.3d___, 2021 WL 3362738 at *9–10 (D. Or. Aug. 3, 2021) at *9–10 ("Freedom from imprisonment … lies at the heart of the liberty that the Fifth Amendment's Due Process Clause protects. The Government's assertion that the Court has little role in policing the Fifth Amendment's boundaries in a case where the defendant faces risk of imprisonment is without merit."); *see also U.S. v. Rios-Montano*, 2020 WL 7226441 at *2 (S.D. Cal. 2020) (applying *Arlington Heights* to a constitutional challenge to 8 U.S.C. §1325).

### c. It cannot be that racist laws must stand so long as they touch on immigration.

The government's argument for rational-basis review is wrong on the law, and it fundamentally misunderstands Mr. Cortez-Mendoza's situation as a defendant facing

---

[7] ECF No. 52 at 13. The government also cites to *U.S. v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998), ECF No. 52 at 12–13, but that case simply established Congress has the authority to criminalize reentry—a proposition Cortez-Mendoza does not contest.

criminal charges. This is a routine criminal case. When the government sought to prosecute Mr. Cortez-Mendoza, it took the case before a grand jury.[8] The magistrate arraigned Mr. Cortez-Mendoza and informed him of his rights—to remain silent, to be represented by counsel, to trial by a jury of his peers.[9] Mr. Cortez-Mendoza was granted pretrial release, and he has resided in the community without incident for well over a year.[10] At no point has there been any indication Mr. Cortez-Mendoza's criminal proceedings differ because his alleged crime has some connection to this country's immigration laws.

Just like any other individual facing criminal charges, Mr. Cortez-Mendoza has the right to challenge the law he is alleged to have violated—and to have a court assess whether the law impermissibly discriminates on the basis of race. This is especially the case when that law is employed almost exclusively against one race. If Mr. Cortez-Mendoza and others in his situation were barred from challenging such a law, Congress would have carte blanche to pass any law it wanted—no matter how obviously racist—so long as the law itself was couched in neutral terms and somehow touched on immigration.

---

[8] *See* ECF No. 22.
[9] *See* ECF No. 27.
[10] *See* ECF No. 17.

The government disagrees and insists it is permitted to prosecute Mr. Cortez-Mendoza (and potentially send him to prison for years) without the Court so much as considering whether § 1326 was passed specifically to target Latinxs.

This cannot be. It cannot be that courts are barred from analyzing whether a law violates the Constitution on the basis of race—the most suspect category, *see Loving v. Virginia*, 388 U.S. 1, 11 (1967) ("the Equal Protection Clause demands that racial classifications, especially suspect in criminal statutes, be subjected to the most rigid scrutiny")—simply because the law has some connection to immigration. The "sensitive inquiry" demanded by *Arlington Heights* provides a necessary bulwark against precisely such unconstitutional discrimination. 429 U.S. at 266.

**2.  The government concedes Congress acted with discriminatory intent when it criminalized reentry.**

In its response, the government does not contest the overwhelming evidence showing the 1929 Congress acted with a discriminatory purpose when it criminalized reentry under the Undesirable Aliens Act.  The government provides no competing expert opinion regarding the legislative history, historical background, sequence of events, or disparate impact of the statute. The government explicitly conceded this point in separate proceedings. *See Carrillo-Lopez*, 2021 WL 3667330 at *7. There is no question that anti-Latinx animus motivated Congress's passage of the Undesirable

Aliens Act and its criminalization of reentry. As such, Mr. Cortez-Mendoza has established discriminatory intent.

### a. Recodification does not denounce or erase discriminatory intent.

Despite characterizing the Undesirable Aliens Act's unlawful reentry provision as the "first version" of § 1326,[11] the government now insists this concededly racist "first version" has no bearing on the almost-identical law recodified at § 1326 in 1952. The government argues legislative intent does not "carr[y] over from one law to the next."[12] This is contrary to the Supreme Court's instruction that "in construing [a statute] we may refer to the ***purpose*** and scope of the act from which it was derived." *U.S. v. Mason*, 218 U.S. 517, 525 (1910) (emphasis added); *see also U.S. v. Ryder*, 110 U.S. 729, 740 (1884) ("[i]t will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed"); *U.S. v. Nishiie*, 996 F.3d 1013, 1026 (9th Cir. 2021) ("codification does not alter congressional meaning evident from prior history").

The government relies heavily on *Abbott v. Perez*, 138 S. Ct. 2305 (2018), without acknowledging that *Abbott* itself confirms that the original legislature's intent is relevant to determining the reenacting legislature's intent, "to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding" such intent. *Id.* at

---

[11] ECF No. 50, Ex. T (United States Attorneys' Bulletin, dated July 2017) at 1.
[12] ECF No. 52 at 20.

1    2327. In *Abbott*, the Supreme Court made clear that the law in question withstood an

2    *Arlington Heights* challenge only because the reenacting legislature had not "carried

3    forward the effects of any discriminatory intent on the part of the" legislature that had

4    initially enacted a racist law. *Id.* at 2325. The Court distinguished *Hunter v. Underwood*,

5    471 U.S. 222 (1985), where "amendments [to a racist law] did not alter the intent" of

6    the law—and the law was therefore unconstitutional. 138 S. Ct. at 2325. And the Court

7    upheld the law in question only because the reenacting legislature had engaged with the

8    racism behind the original law and passed a new law explicitly created to "fix the

9    problems identified." 138 S. Ct. at 2329.

10        Here, the 1952 Congress didn't engage with the 1929 law's racist history at all; it

11    failed to denounce the intent that motivated the original basis for the criminal reentry

12    statute. It simply shifted the unlawful reentry statute to a different section of the U.S.

13    Code as part of the McCarran-Walter Act's consolidation of immigration laws,

14    tweaking the language to make it easier to prosecute that crime. This did nothing to

15    cure the racist motivations behind the statute.

16        Recognizing Congress did not "fix the problems identified," the government

17    offers a curious explanation: the law is too simple to fix.[13] But if it's so simple, why has

18    Congress amended it five separate times? The 1952 Congress's decision to tweak the

19

---

[13] ECF No. 52 at 19 ("[C]riminalizing illegal reentry is rather simple; one of the least complex laws in the United States Code. How could the [1929 and 1952] laws not be similar?").

statute only to make it easier to prosecute the offense—by expanding it to cover those "found in" the U.S., while continuing to protect employers and ensure border enforcement remained lax—is a clear sign Congress did not engage with the law's racist origins and made no effort to "fix the problems identified."

Recent Ninth Circuit case law demonstrates the error of the government's view. In *U.S. v. Rizo-Rizo*, 16 F.4th 1292 (9th Cir. 2021), the Ninth Circuit looked to the Undesirable Aliens Act of 1929 when assessing 8 U.S.C. §1325, which criminalizes entry (as opposed to reentry). The Ninth Circuit found it important that "the precursor statutes to both §1325(a) and § 1326(a), which bear substantially similar language to the modern statutes, were enacted together in 1929 as part of" the Undesirable Aliens Act. *Id.* at 1298. Why? Because "when statutes are enacted shortly after one another and address the same subject and use similar language, that demonstrates Congress's intent that they have the same meaning." *Id.* That is, the Ninth Circuit explicitly tied § 1326 to its "precursor statute," the Undesirable Aliens Act, finding it was "Congress's intent that they have the same meaning." *Id.* It is therefore appropriate for this Court to construe § 1326 by referring to its precursor statute, the Undesirable Aliens Act's unlawful reentry provision, and to find discriminatory intent.

In short, Judge Du was correct to find that "a prior version of a statute known to be motivated by racial animus may be considered as infecting its present iteration if it was not, in fact, substantially altered." *Carrillo-Lopez*, 2021 WL 3667330 at *10.

     **b. Dr. Kang's expert opinion confirms the 1952 Congress acted with a discriminatory purpose when it recodified the unlawful reentry statute.**

Because racial animus motivated the 1929 Congress to criminalize reentry under the Undesirable Aliens Act, and because the 1952 Congress simply recodified that law at § 1326 without engaging with its discriminatory intent, there is no need for the Court to assess the McCarran-Walter Act under *Arlington Heights*. The 1952 Congress's recodification of the Undesirable Aliens Act's unlawful reentry statute—without debate on (and with full knowledge of) the statute's discriminatory intent and disparate impact—establishes the discriminatory intent needed under *Arlington Heights*.

However, should the Court assess the McCarran-Walter Act, the record (particularly as buttressed by Dr. Kang's evidence) demonstrates, by at least a preponderance of the evidence, that racial animus was a motivating factor in the 1952 Congress's recodification of the unlawful reentry statute at § 1326. Such an assessment would require "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including (1) the "historical background of the decision," (2) the "specific sequence of events leading to the challenged decision," (3) the

"legislative or administrative history," and (4) any "[d]epartures from normal procedural sequence." *Arlington Heights*, 429 U.S. at 265–68.

Out of an abundance of caution, Mr. Cortez-Mendoza walked through that analysis for the McCarren-Walter Act.[14] Here, he adds Dr. Kang's evidence:

### i. The first factor (the law's historical background) shows a discriminatory purpose.

Mr. Cortez-Mendoza highlighted three particular areas of § 1326's historical background. First, the racial animus underpinning the Undesirable Aliens Act of 1929, which informed the 1952 Congress's recodification of the unlawful reentry provision.[15] Second, the anti-Latinx racism that continued from 1929 to 1952, most notably the "repatriation drives" of the Great Depression and the subsequent "Bracero Program."[16] Third, the 1952 Congress's debate and passage of the "Wetback Bill," which included regular use of the racial slur "wetback," just two months before its passage of the McCarran-Walter Act.[17]

---

[14] ECF No. 50 at 21–32.
[15] ECF No. 50 at 21.
[16] ECF No. 50 at 22–25. Dr. Kang provided substantial additional evidence on the "Bracero Program," a particularly dark chapter in this country's history. ECF No. 50, Ex. S at 6–12. Dr. Kang concludes that "the immigration enforcement policies of the Bracero era powerfully reinforced longstanding racist notions that Mexican migrants deserved admission into the United States not as prospective citizens but instead as a cheap, exploitable, and deportable force." *Id.* at 11.
[17] ECF No. 50 at 25–26.

The government does not contest the racial animus underpinning the Undesirable Aliens Act, the anti-Latinx racism that continued through 1952, or the repeated use of the racial slur "wetback" by members of Congress just two months before they recodified the unlawful reentry statute at § 1326. The government's only response is to note the "Wetback Bill" did not address unlawful reentry.[18] It is not surprising the government has little to say in the face of such overwhelming evidence of racial animus. While the government's one point (that the "Wetback Bill" did not address unlawful reentry) is correct, Congress's regular use of that epithet is certainly "historical background" evidence of racial animus from the body that would pass the McCarran-Walter Act just two months later.

To the extent the Court questions whether the historical background leading up to Congress's passage of the McCarran-Walter Act demonstrates racial animus, Dr. Kang addresses that issue thoroughly. As Dr. Kang explains, Senator McCarran was a racist and anti-Semite who drafted provisions barring European Jews' admission to the U.S. in the 1940s.[19] He described the threat of immigration as one of the United States being "overrun, perverted, contaminated, or destroyed."[20] He also worked to ensure

---

[18] ECF No. 52 at 18.

[19] *See* ECF No. 50, Ex. S at 18–19 n.54. *See also* Ex. U (Letter from Senators Jacky Rosen and Catherine Cortez Masto and Representatives Steven Horsford, Dina Titus, and Susie Lee, dated June 19, 2020), describing Senator McCarran's "dark legacy of virulent racism, anti-Semitism, and xenophobia," describing him as "a man who advocated bigotry," and requesting that his statue be removed from the National Statuary Hall Collection.

[20] *See* ECF No. 50, Ex. V.

the continued vitality of the compromise struck in the Undesirable Aliens Act: granting Anglo business owners access to cheap Latinx labor (by weakening border protection and continuing the exemption of Latin America from the national quota system) while ensuring Latinxs could not become permanent members of the community (through various means, including the expanded criminalization of reentry).[21] Even the State Department agrees Senator McCarran was motivated to secure passage of the McCarran-Walter Act by concern "that unassimilated aliens could threaten the foundations of American life."[22] As Dr. Kang summarizes it:

> [A]nti-Mexican animus informed the passage of the 1929 Undesirable Aliens Act and its 1952 revision. Racist conceptions of Mexican immigrants as exploitable and deportable farm workers led to the passage of laws that facilitated the labor management needs of southwestern agribusiness. In times of prosperity, agricultural labor programs, such as the Bracero Program, welcomed Mexicans to the United States; in moments of economic crisis, however, laws such as the Undesirable Aliens Act and Sections 275 and 276 of Public Law 414 [§1325 and § 1326, the unlawful entry and reentry statutes] could be used to deter prospective arrivals. In short, the 1929 and 1952 criminal penalties for undocumented re-entry reinforced the precarious status of Mexican workers in the US and reflected the racist notion that Mexican migrants were unfit for citizenship.[23]

Dr. Kang's evidence is consistent with—and builds on—the historical background set out in Mr. Cortez-Mendoza's motion. It establishes beyond any doubt that the

---

[21] *See* ECF No. 50, Ex. S at 18–19.
[22] U.S. Dep't of State, Office of the Historian, *The Immigration and Nationality Act of 1952 (The McCarran-Walter Act)*, https://bit.ly/32d4Y6B.
[23] ECF No. 50, Ex. S at 99.

historical background of the McCarran-Walter Act supports a finding that racial animus motivated the 1952 Congress to recodify the unlawful reentry statute at § 1326.

### ii. The second factor (events leading up to the law) shows a discriminatory purpose.

Mr. Cortez-Mendoza highlighted two events leading up to the recodification of the unlawful reentry statute at § 1326: Congress's passage of the "Wetback Bill" two months earlier and Deputy Attorney General Peyton Ford's use of the racial slur "wetback" in a letter to the Judiciary Committee regarding the unlawful reentry statute.[24] The government does not dispute that "wetback" is a racial slur and was understood as such in 1952, but argues Ford's use of the epithet "cannot be indicative of the motivations of Congress" in enacting § 1326 because Ford was not a member of Congress.[25]

---

[24] ECF No. 50 at 26–27.

[25] ECF No. 52 at 19. While government counsel in this case does not argue "wetback" was ever an appropriate way to refer to Mexicans, his colleagues at the Department of Justice have taken a different tack. In the Opening Brief of its appeal in *Carrillo-Lopez*, the government argues that this highly offensive term was, in the early 1950s, "often used to refer to an undocumented worker from Mexico" and the term has come to be "understood as a 'racial epithet'" only as a result of "linguistic norms chang[ing] over time." *U.S. v. Carrillo-Lopez*, Ninth Circuit Case No. 21-10233, Dkt. Ent. 5 at 48. The government offers no support for this argument other than its assertion that many people used the term "wetback" in the early 1950s. *Id*. at 48–49. It is not difficult to think of other racial slurs that were once common in this country that were offensive then and remain so now. Common usage in no way suggests the term "wetback" was anything but a racial slur in the early 1950s. As Professor Gonzalez-O'Brien testified in *Carrillo-Lopez*, the "term 'wetback' is one that is racially derogatory [and] was recognized as being racially derogatory at the time." ECF No. 61-5 at 90.

Mr. Cortez-Mendoza maintains the open racism of the man speaking for the Department of Justice is significant. Regardless, Dr. Kang has pointed to instances of Senator McCarran (the man behind the 1952 recodification of the unlawful reentry statute) using the racial slur "wetback." He did so repeatedly, including in Senate committee hearings in 1951 and 1953.[26]

Even were the Court to agree with the government that Ford's use of the term "wetback" is limited evidence of racial animus because Ford was not a member of Congress, that argument does not carry over to Senator McCarran. Not only was Senator McCarran a member of Congress, he was the driving force behind the McCarran-Walter Act. His open anti-Latinx racism is significant evidence of the racial animus that motivated the codification of the unlawful reentry statute at § 1326.

### iii. The third factor (legislative history) shows a discriminatory purpose.

The government argues the scarcity of legislative history regarding § 1326 disqualifies Mr. Cortez-Mendoza's argument.[27] However, Dr. Kang shows that Congress's relative silence around the recodification of the unlawful reentry statute cannot be read as suggesting an absence of racial animus. To the contrary, opponents of § 1326 knew that arguing against the racism underlying that provision would be

---

[26] *See* ECF No. 50, Exs. S, V, W.
[27] ECF No. 52 at 25–26.

ineffective because Senator McCarran "regularly wielded his authority to delay and block the passage of any liberal immigration reforms."[28]

As Dr. Kang establishes, "[t]hose congressmen who were most likely to attack the racist premises of the nation's immigration laws admitted that such a challenge would fail due to the pervasive racism among their fellow members in Congress and the institutional advantage wielded by the nativists and segregationists."[29] Or, as Representative Emanuel Celler of New York put it, "I knew that a really liberal immigration bill … had no more chance of being enacted this session than could a bit of butter remain intact on a hot stove."[30]

While there was little discussion of the 1952 recodification of the unlawful reentry statute at § 1326, Congress's one change to the law was telling.[31] That one change was to expand the law to cover those "found in" the United States, thereby massively extending the scope of the 1929 law.[32] This change served no purpose other than to make it easier to prosecute the Latinxs that Congress knew were disparately

---

[28] ECF No. 50, Ex. S at 19.

[29] ECF No. 50, Ex. S at 23.

[30] *See* ECF No. 50, Ex. S at 20.

[31] In addition to this change to the unlawful reentry statute, Congress lessened the penalty for unlawful entry (recodified at 8 U.S.C. §1325) from a felony to a misdemeanor, specifically to avoid the need to present the case to a grand jury and to deprive defendants of a jury trial. INS pursued this revision because grand juries "typically shared the sentiments of southwestern agribusiness regarding Mexican farm workers and, as a result, often refused to indict." *See* ECF No. 50, Ex. S at 22. Over 90% of immigration crimes were "no-billed" in El Paso, TX, in the late 1940s. *See* ECF No. 50, Ex. S at 22, n.69.

[32] *See* ECF No. 50, Ex. S at 21.

impacted by the racially motivated law. This legislative history demonstrates that racial animus was a motivating factor in Congress's recodification of the unlawful reentry statute at § 1326.

### iv. The fourth factor (deviations from procedural norms) shows a discriminatory purpose.

Mr. Cortez-Mendoza highlighted three relevant deviations from procedural norms: Congress passed the Wetback Bill just two months before enacting § 1326, Congress expanded the unlawful reentry statute based on a letter using a racial slur, and Congress passed § 1326 with little debate despite knowing of its disparate impact on Latinxs.[33] Dr. Kang identified two additional deviations:

First, Congress obstructed efforts at effective border enforcement. As Dr. Kang sets out, "congressional conservatives, particularly southern and western Democrats, played a key role in weakening or blocking immigration enforcement bills."[34] While leaders of the Immigration and Naturalization Service (INS) repeatedly asked the Appropriations Committee (of which Senator McCarran was a member) for funds to hire more Border Patrol agents and to construct more processing facilities to control the number of unlawful entries, Senator McCarran "worked to remove obstacles to the undocumented crossings of Mexican workers" and "routinely supported reductions in

---

[33] ECF No. 50 at 29–31. The government did not engage with these arguments and instead simply stated (incorrectly) that Cortez-Mendoza "had failed to reveal procedural or substantive irregularities underlying the [McCarran-Walter Act]." ECF No. 52 at 26.
[34] ECF No. 50, Ex. S at 15.

funding for border enforcement operations."[35] Senator McCarran's support of INS

budget cuts "defended a widespread system of labor exploitation premised upon racist

notions of Mexican migrants as expendable farmworkers."[36] Senator McCarran

justified a denial of an INS appropriations request by explaining southwestern growers'

"desire for these wetbacks" took precedence over the agency's enforcement needs.[37]

Second, Congress rejected INS's proposal for employer penalties to deter

unlawful immigration. As Dr. Kang establishes, INS proposed such sanctions, and the

Truman administration published that recommendation in a 1951 report explaining that

(as Dr. Kang summarizes it) "American growers created the conditions that drew

undocumented works to the United States in the first place"—and that it was those

American growers "rather than the migrants themselves, [who] bear the principal

responsibility for the so-called crisis on the border."[38] But, "[a]s in the 1920s, racist

conceptions of Mexican migrants as the ideal agricultural workforce led congressional

conservatives to ... reject efficacious employer penalty proposals."[39]

These irregularities demonstrate that it was racial animus—not a race-neutral

desire to prevent unlawful immigration—that motivated Congress's recodification of

---

[35] ECF No. 50, Ex. S at 17.
[36] ECF No. 50, Ex. S at 17.
[37] *See* ECF No. 50, Ex. S at 18; Ex. W at 245.
[38] ECF No. 50, Ex. S at 14.
[39] ECF No. 50, Ex. S at 13. These efforts were led by Senator Allen Ellender of Louisiana, the son of Louisiana plantation owners, a lifelong segregationist and civil rights opponent, and an ally of agribusiness. *See* ECF No. 50, Ex. S at 15–16.

the unlawful reentry statute at § 1326. If Congress's true aim was preventing unlawful immigration, it was illogical and counter-intuitive for it to cut the border enforcement budget and to refuse to sanction employers who hired undocumented immigrants.

*        *        *

Based on the record before the Court in *Carrillo-Lopez*, Judge Du was correct to find "the totality of the evidence shows that the same factors motivating the passage of [the unlawful reentry statute] in 1929 were present in 1952"—meaning, "racial animus was at least one motivating factor behind the enactment of Section 1326." 2021 WL 3667330 at *10, 16. Dr. Kang's additional evidence only underscores that point.

### 3. Subsequent amendments to § 1326 do not cleanse the law of racial animus.

In its response, the government argues Congress's amendments to § 1326 "provide incontrovertible evidence that Congress would have criminalized unlawful reentry regardless of any racially discriminatory motivation from the 1920's."[40] (Once a challenger has established discriminatory intent, "the burden shifts to the law's defenders to demonstrate that the law would have been ***enacted*** without" the motivating factor of racial discrimination. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).) But those amendments have no bearing on the one relevant question: whether

---

[40] ECF No. 52 at 27.

1   the Congress that **enacted** (not amended) the unlawful reentry statute would have done

2   so absent racial animus.

3        The government's argument misses the distinction between enacting a bill and

4   amending a bill already on the books, and the government does not argue the 1929

5   Congress or 1952 Congress would have criminalized reentry without the motivating

6   factor of racial discrimination.

7        Even were the Court to determine that actions of an amending Congress could

8   theoretically demonstrate the intent behind a law it did not enact, there is no such

9   evidence here. None of the amendments to § 1326 involved Congress reconsidering the

10  decision to criminalize reentry or denounce the prior racist intent. Quite the opposite.

11  The amendments expanded the pool of individuals who could be punished, stiffened

12  penalties, and limited collateral attacks on removal orders—all ensuring more Latinxs

13  would be incarcerated for more time. As Judge Du found, the amendments "do not

14  reflect any change of Congressional intent, policy, or reasoning, but merely work to

15  increase Section 1326's deterrent value." *Carrillo-Lopez*, 2021 WL 3667330 at *23. The

16  Supreme Court has agreed, noting (with respect to the 1988 amendment) the

17  legislative history "speaks about, and only about, the creation of new penalties."

18  *Almendarez-Torres v. U.S.*, 523 U.S. 224, 234 (1998). At no point since 1929 has

19  Congress debated unlawful reentry or given any indication it would have criminalized

reentry had that law not already been on the books.

Finally, even were the Court to determine one or more of the amending Congresses would have criminalized reentry, none would have done so without the motivating factor of racial discrimination. While the government argues "no evidence of racial animus exists" with respect to the amending Congresses,[41] Dr. Kang thoroughly refutes that claim by developing the record for each of the five amendments, which are contained in:

> 1) the Anti-Drug Abuse Act of 1988;
>
> 2) the Immigration Act of 1990;
>
> 3) the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA);
>
> 4) the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA); and
>
> 5) the Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).[42]

As Dr. Kang details, these amendments were authored by elected officials from Florida (Senator Lawton Chiles, Senator Bob Graham, and Representative Bill McCollum) working in close conjunction with the Federation for American Immigration Reform (FAIR)—an anti-immigrant hate group, as designated by the Southern Poverty Law Center—in response to a perceived crisis that the nation had lost control of its borders.[43] While shifting societal norms made the overt racism of earlier decades

---

[41] ECF No. 52 at 21.

[42] ECF No. 50, Exs. R-Y.

[43] ECF No. 50, Ex. S at 25; Southern Poverty Law Center, *Federation for American Immigration Reform*, https://bit.ly/3qgZike.

1    unacceptable and the legislative history is therefore less rife with racial slurs, Dr. Kang

2    demonstrates that each amendment to § 1326 was "enacted with a discriminatory

3    purpose."[44]

4                          *              *              *

5        Judge Du was correct to hold that § 1326's amendments "never substantively

6    altered the original provision," "did not change the operation of Section 1326," and

7    "do not reflect any change of Congressional intent, policy, or reasoning, but merely

8    work to increase Section 1326's deterrent value." *Carrillo-Lopez*, 2021 WL 3667330 at

9    *23. These amendments are irrelevant to the analysis of whether the unlawful reentry

10    statute violates equal protection.

11        Regardless, it's clear § 1326's amendments "demonstrate that lawmakers made

12    no effort to examine and acknowledge the legacy of racism that informed the passage

13    of" the Undesirable Aliens Act of 1929 and its recodification as § 1326—and that they

14    in fact perpetuated the "racism that informed the passage of these earlier laws ."[45] As

15    Dr. Kang concludes, each amendment was "enacted with a discriminatory purpose."[46]

16        These amendments in no way cleansed § 1326 of its racial animus.

17

18

19

---

[44] ECF No. 50, Ex. S at 1.
[45] ECF No. 50, Ex. S at 50.
[46] ECF No. 50, Ex. S at 1.

### 4. Section 1326 disparately impacts Latinxs.

Having established discriminatory intent, Mr. Cortez-Mendoza must show disparate impact to make out an equal protection violation. The government misunderstands what such a disparate-impact showing entails.

Under *Arlington Heights*, the disparate-impact inquiry is separate and distinct from that of discriminatory intent. For the disparate-impact inquiry, the question is simply a matter of numbers: whether the law "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (cleaned up).[47]

This distinction matters because it shapes the inquiry. While the assessment of discriminatory intent involves parsing legislative history, the disparate-impact inquiry is purely mathematical. Courts look to the numbers without any need to search for an explanation behind disparities.

The sole question here is: does § 1326 disparately impact Latinxs? The answer is clear: yes, it does. The government does not dispute that, from the enactment of the Undesirable Aliens Act up to today, 85 to 99 percent of unlawful reentry prosecutions have been brought against Latinxs.[48] The *Machic-Xiap* court described this as "strong

---

[47] That question concerns the law's impact in the current day. *See Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (finding disparate impact because the law "continues to this day" to have such an effect).

[48] *See* ECF No. 50 at 6. Oddly, the government takes issues with Cortez-Mendoza for noting that it had, in prior cases, "not disputed the statute bears more heavily on Latinxs." The government calls this a "mischaracterization"—and then, in the very next sentence, agrees that "most prosecutions for illegal reentry are against persons from Latin America." ECF No. 52 at 23 n.9

1    evidence" of disparate impact. 2021 WL 3362738 at *10. And, as Judge Du noted,

2    "[t]hese numbers are in line with other successful *Arlington Heights* challenges."

3    *Carrillo-Lopez*, 2021 WL 3667330 at *6. Mr. Cortez-Mendoza has made the necessary

4    showing.

5         The government's response is confused. While the government appreciates that

6    disparate impact and discriminatory intent are separate inquiries,[49] it conflates them.

7    For example, the government characterizes Mr. Cortez-Mendoza's motion as "cit[ing]

8    the higher percentage of illegal reentry prosecutions of Latinx defendants as proof of

9    disparate impact ***and discrimination***," and argues he "cannot show a true disparate

10   impact ***caused by racial animus***."[50] To be clear, Mr. Cortez-Mendoza's arguments

11   concerning disparate impact have nothing to do with discrimination or racial animus.

12        The government's confusion carries over to its misreading of *Dep't of Homeland*

13   *Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020). There, the Supreme Court

14   found that a showing of disparate impact alone (i.e., without a separate showing of

15   discriminatory intent) does not make out an equal protection claim. Judge Du correctly

16   summarized this finding and followed it. *Carrillo-Lopez*, 2021 WL 3667330 at *6. This

17

18   _____

19   (quotations and citations omitted). To say that a statute "bears more heavily on Latinxs" is
     precisely to say that "most prosecutions are against persons from Latin America."
     [49] ECF No. 52 at 26 (recognizing "disparate impact either exists or it doesn't and is independent
     from whether there is also evidence of discriminatory intent").
     [50] ECF No. 52 at 23 (emphasis added).

1   is uncontroversial, yet the government describes Judge Du's reasoning as "highly

2   questionable" and "illogical."[51]

3        To support its claim, the government selectively quotes the relevant portion of

4   the Supreme Court's opinion—and adds words of its own that twist the Court's

5   meaning. Here's how the government sets out what it describes as the Court's

6   "unambiguous" holding: "[W]hen referencing the fact that 'Latinos make up a large

7   share of the unauthorized alien population,' the Court expressly held that '[w]ere this

8   fact sufficient to state a claim' *of disparate impact*, 'virtually any generally applicable

9   immigration policy could be challenged on equal protection grounds.'"[52]

10       This is a misreading of what the Supreme Court actually said in *Regents*. The

11  Court was discussing whether the respondents had made out "a plausible equal

12  protection claim"—and said nothing about a claim "of disparate impact."[53] By

13  inserting the words "of disparate impact," the government distorts the Court's clear

14  meaning. As the *Machic-Xiap* court put it when addressing the same argument from the

---

[51] ECF No. 52 at 25.

[52] ECF No. 52 at 24 (emphasis added).

[53] The relevant portion of *Regents* reads: "[R]espondents allege that animus is evidenced by (1) the disparate impact of the rescission on Latinos from Mexico, who represent 78% of DACA recipients; (2) the unusual history behind the rescission; and (3) pre- and post-election statements by President Trump. None of these points, either singly or in concert, establishes a plausible *equal protection claim*. First, because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." 140 S.Ct. at 1915–16 (citations omitted) (emphasis added).

government, "The quoted text does not state that the DACA recipients had not presented evidence of disparate impact. Indeed, the Supreme Court itself characterized the DACA recipient's statistical evidence as evidence of 'the *disparate impact* of the recission [of DACA] on Latinos.'" 2021 WL 3362738 at *11 n.64 (quoting *Regents*, 140 S. Ct. at 1915) (emphasis in original).

Having confused the issue, the government attempts to explain away the overwhelming evidence of disparate impact as "a feature of geography and geopolitics – Latin America's proximity to the United States and related socioeconomic and political conditions."[54] But the disparate-impact analysis is not concerned with the reason for the disparity. The *Machic-Xiap* court correctly summarized the government's error in rejecting the same argument: "The Government misdescribes disparate impact. That an innocent explanation may exist for the disparity does not eliminate the disparity." 2021 WL 3362738 at *11.

To make a showing of disparate impact, Mr. Cortez-Mendoza only needs to show that § 1326 "bears more heavily" on Latinxs. He has done that.

### III.  Conclusion

Nationwide, one-third of the federal docket is § 1326 prosecutions. Each year, there are thousands and thousands of initial appearances, arraignments, detention hearings, changes of plea, and sentencings for impoverished Latinxs encouraged to

---

[54] ECF No. 52 at 24.

come work this country's fields, only to be locked up for daring to cross the border. Meanwhile, Anglo employers cast cursory glances at undocumented Latinx laborers' papers, knowing there's no realistic threat of the government cracking down on their unlawful hiring practices. Doing so would disturb the nearly century-old compromise: a steady supply of cheap Latinx labor for Anglo businesses, but with criminal laws on the books to punish and drive out the "rat men" when needed.

The government's attempts to shield the unlawful reentry statute from scrutiny are unavailing. Congress enacted that law to uphold this nation's unconscionable compromise. Section 1326 serves as a reminder that xenophobia and racism have always been a part of our history and our laws. "Racist conceptions of Mexican immigrants as exploitable and deportable farm workers led to the passage of laws that facilitated the labor management needs of southwestern agribusiness," and "the 1929 and 1952 criminal penalties for undocumented re-entry reinforced the precarious status of Mexican workers in the US and reflected the racist notion that Mexican migrants were unfit for citizenship."[55]

With this history, it's unsurprising the government asks the Court not to look behind the curtain. But the Constitution demands that courts examine criminal statutes

---

[55] ECF No. 50, Ex. S at 99.

1  for discriminatory intent and disparate impact in order to ensure equal protection

2  under the law.

3      One cannot uncouple § 1326's history from the history of anti-Latinx racism in

4  the United States. But joining Judge Du in recognizing that § 1326 offends the

5  Constitution would acknowledge that sordid history and allow the country to begin to

6  address it.

7  Dated: March 4, 2022.

8
            Federal Defenders of Eastern Washington & Idaho
            Attorneys for Obet Cortez-Mendoza

9           s/Molly M. Winston
            Molly M. Winston, WSBA #50416
10          10 North Post Street, Suite 700
            Spokane, Washington 99201
11          (509) 624-7606
            molly_winston@fd.org
12

13                      Service Certificate

14      I certify that on March 4, 2022, I electronically filed the foregoing with the

15  Clerk of the Court using the CM/ECF System, which will notify Assistant United

16  States Attorney Michael Ellis.

17          s/Molly M. Winston
            Molly M. Winston, WSBA #50416
18          10 North Post Street, Suite 700
            Spokane, Washington 99201
19          (509) 624-7606
            molly_winston@fd.org